NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12051
SJC-12052


ENGIE GAS & LNG LLC[1]  vs.  DEPARTMENT OF PUBLIC UTILITIES
(and another case[2]).



Suffolk.     May 5, 2016. – August 17, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk,
& Hines, JJ.[3]




Department of Public Utilities.  Practice, Civil, Review of
    order of Department of Public Utilities.  Electric
    Company.  Public Utilities, Electric company, Judicial
    review.  Gas.  Administrative Law, Judicial review,
    Rulemaking, Agency's authority, Rate regulation.  Statute,
    Construction.




    Civil actions commenced in the Supreme Judicial Court for
the county of Suffolk on October 26 and November 2, 2015.

_____

    [1] ENGIE Gas & LNG LLC (ENGIE) filed its petition under its
previous name, GDF Suez Gas NA LLC.

    [2] Conservation Law Foundation  vs.  Department of Public
Utilities.

    [3] Justice Cordy participated in the deliberation on this
case and authored this opinion prior to his retirement.
Justices Spina and Duffly participated in the deliberation on
this case prior to their retirements.

The cases were reported by Cordy, J.

Thaddeus A. Heuer (Adam P. Kahn & Jesse Harlan Alderman with him) for ENGIE Gas & LNG LLC.

David K. Ismay for Conservation Law Foundation.

Seth Schofield, Assistant Attorney General, for the Attorney General.

Thomas H. Hayman, Special Assistant Attorney General (Francis R. Powell, Special Assistant Attorney General, with him) for the Department of Public Utilities.

Cheryl M. Kimball & Matthew A. Sanders, for NSTAR Electric Company & others, amici curae, submitted a brief.

CORDY, J.   These consolidated appeals are before us on a single justice's reservation and report of challenges made to an order of the Department of Public Utilities (department).  Those challenges raise the question of the department's authority to review and approve ratepayer-backed, long-term contracts entered into by electric distribution companies for additional natural gas pipeline capacity in the Commonwealth pursuant to G. L. c. 164, § 94A, which requires gas and electric companies to receive departmental approval for any contract for the purchase of gas or electricity lasting longer than one year.

The plaintiffs, ENGIE Gas & LNG LLC and Conservation Law Foundation, contend that the order amounted to improper rulemaking in violation of the Administrative Procedure Act, G. L. c. 30A.  They also argue that the department's determination that it has authority pursuant to G. L. c. 164, § 94A, to approve such contracts constitutes an error of law

because it contravenes G. L. c. 164, § 94A, as amended through St. 1997, c. 164 (restructuring act).[4]

We disagree that the order of the department is an improperly promulgated rule or regulation. We nevertheless reach the statutory question presented by the plaintiffs, and conclude that the order is invalid in light of the statutory language and purpose of G. L. c. 164, § 94A, as amended by the restructuring act, because, among other things, it would undermine the main objectives of the act and reexpose ratepayers to the types of financial risks from which the Legislature sought to protect them.[5,6]

---

[4] Statute 1997, c. 164 (restructuring act), discussed infra, restructured the electric utility industry, transforming "it from a government-regulated monopoly, to 'a framework under which competitive producers [would] supply electric power and customers [would] gain the right to choose their electric power supplier.'" Northeast Energy Partners, LLC v. Mahar Regional Sch. Dist., 462 Mass. 687, 695 (2012), quoting St. 1997, c. 164, § 1 (c) (ii). Importantly, the restructuring act separated the three utility services of generation, transmission, and distribution, and deregulated the generation component in the interests of competition. Northeast Energy Partners, LLC, supra at 696. Companies providing transmission and distribution services remain regulated by the State. Id.

[5] Because we determine that the Department of Public Utilities (department) erred in interpreting its authority under G. L. c. 164, § 94A, we need not reach the question of Federal law presented by ENGIE.

[6] We acknowledge the amicus briefs submitted by the Attorney General and by NSTAR Electric Company and Western Massachusetts Electric Company, each doing business as Eversource Energy, and Massachusetts Electric Company and Nantucket Electric Company, each doing business as National Grid.

1.  Background.  The department regulates the rates that both electric distribution companies[7] and local distribution natural gas companies[8] may charge their customers (ratepayers). G. L. c. 164, § 94A.  See Fitchburg Gas & Elec. Light Co. v. Department of Pub. Utils., 460 Mass. 800, 801 (2011); Attorney Gen. v. Department of Pub. Utils., 453 Mass. 191, 192 (2009).

In 2015, the Department of Energy Resources (DOER) filed a petition asking the department to investigate the means by which new natural gas delivery capacity[9] might be added to the New

---

[7] An electric distribution company is the "arm of a utility responsible for transmitting electricity from a generation facility or power grid to the end consumer."  Franklin W. Olin College Of Eng'g v. Department of Telecomm. & Energy, 439 Mass. 857, 860 n.6 (2003).  See G. L. c. 164, § 1 (defining "[d]istribution company").  Electric distribution companies provide two types of services:  supply services and distribution services.  See NSTAR Elec. Co. v. Department of Pub. Utils., 462 Mass. 381, 381 (2012).

[8] Local gas distribution companies "mak[e] and sell[] or distribut[e] and sell[]  . . .  gas within the commonwealth."  See G. L. c. 164, § 1 (defining "[g]as company").

[9] Prior to the Federal restructuring of interstate pipeline service by the Federal Energy Regulatory Commission (FERC) (see FERC Order No. 639, 18 C.F.R. Part 284 [Apr. 8, 1992]), gas and the pipeline space, or "capacity," necessary to deliver it were "bundled," or sold together.  Once "unbundled," the department recognized the distinction between the two elements of interstate gas services as "blurred, at best" and established that contracts for both would be similarly approved as "contract[s] for the purchase of gas" pursuant to G. L. c. 164, § 94A, under the same "public interest standard."  D.P.U. 94-

England market in order to mitigate price volatility experienced by ratepayers in the Commonwealth, especially in the winter months.  See D.P.U. 15-37 (Oct. 2, 2015).  The DOER specifically asked whether the department, pursuant to its authority under G. L. c. 164, § 94A, could approve long-term contracts[10] by Massachusetts electric distribution companies for the purchase and resale of interstate natural gas pipeline capacity.  The DOER stated that the ultimate goal of such purchases would be to lower "gas constraint-driven high prices" for electricity in New England by lowering the prices, particularly in the wintertime, of wholesale electricity across the region.

In support of its request, the DOER asserted that gas pipeline constraints have caused unreasonably high winter electric prices in New England.  Unlike local natural gas distribution companies, which regularly contract for gas capacity, electric generators that use natural gas to produce electricity[11] are generally unwilling or unable to enter into long-term contracts to secure firm gas capacity.  For these generators, there is added risk for such contracting because

_____

174-A, at 22-26 (Mar. 15, 1994). We therefore use the terms "gas" and "gas capacity" interchangeably.

[10] By the terms of G. L. c. 164, § 94A, any contract in excess of one year constitutes a long-term contract.

[11] Generation is "the act or process of transforming other forms of energy into electric energy or the amount of electric energy so produced."  G. L. c. 164, § 1.

there is no means by which they can be reasonably assured of receiving enough revenue to cover the cost of securing the gas capacity over the course of each year. Pipeline companies, on the other hand, are not willing to build new pipeline capacity without having long-term contracts in place. Thus, pipeline companies do not have sufficient assurances such that they are willing to build additional pipeline capacity for natural gas-fired electric generators, despite the increasing natural gas demand for heating and as a source of supply for electric power. The DOER characterized this situation as a "mismatch" of needs and incentives that requires a "solution."

Under the DOER's proposal, (1) the department would authorize, pursuant to G. L. c. 164, § 94A, electric distribution companies to enter into contracts to purchase gas pipeline transportation capacity to be funded by the Commonwealth's ratepayers through rates set and approved by the department; (2) the pipeline owners (which in this case will include affiliates of electric distribution companies) will use those transportation contracts to help finance the construction of new gas pipeline capacity in the region; (3) after the pipelines are expanded, the electric distribution companies will release (resell) their contracted-for capacity to electric

generators or "into the market";[12] and (4) the release of that capacity will increase gas supply and thus lower the wholesale price of gas and electricity.

Noting that the question was one of first impression, the DOER asked the department to determine whether "(1) there is an innovative mechanism for electric distribution companies . . . or other suitable parties to secure new, incremental gas delivery capacity into the region to the benefit of electric ratepayers; (2) review for cost-recovery of [electric distribution company] contracts for natural gas capacity by the [d]epartment under G. L. c. 164, § 94A . . . is appropriate; and (3) the standard of review the [d]epartment would apply to contracts submitted for approval under that section should be different."  The DOER stated that ratepayer-funded gas capacity contracts entered into by electric distribution companies would solve the "mismatch" problem by providing sufficient financial assurance to pipeline companies to build new pipelines and infrastructure in order to provide gas to natural gas-fired electric generators.

---

[12] Citing to Order Accepting and Suspending Tariff Record and Establishing a Technical Conference, 154 FERC, ¶ 61,269 (Mar. 31, 2016), the Attorney General, in her brief, points out that in order to release the contracted-for capacity to the electric generation companies, the electric distribution companies would first need to obtain a waiver from FERC, because Federal law otherwise prohibits resellers from directing their contracted capacity rights to a particular party unless FERC grants a waiver.  See also 18 C.F.R. § 284.8 (2015).

In response to the petition of the DOER, the department opened an investigation into the means by which new natural gas capacity might be added to the New England market, including measures that electric distribution companies might pursue. After considering input from stakeholders, including written comments submitted by the plaintiffs, the department issued D.P.U. 15-37, entitled, "Order Determining Department Authority Under G. L. c. 164, § 94A" (order).  The department determined that the plain language of § 94A provides the department with the statutory authority to approve gas capacity contracts entered into by electric distribution companies, so long as the department first determines that such long-term contracts are in the public interest.  D.P.U. 15-37, at 19, 43.  The department further concluded that it could properly allow cost recovery for the contracts, including the cost of building the necessary pipeline infrastructure, through electric distribution rates.  Id. at 12, 46.  The department additionally determined that its findings were consistent with the restructuring act because the contracts entered into by the electric distribution companies would not result in the companies' reentry to producing, manufacturing, or generating electricity at wholesale, as contemplated by the restructuring act.  Id. at 26-27.

The order further outlined the filing requirements and standard of review applicable to future proceedings seeking approval of ratepayer-backed contracts for gas capacity entered into by electric distribution companies. Id. at 36, 44-45. Since issuing the order, the department has docketed three petitions by electric distribution companies for the approval of such contracts; however, none has been approved at this time. The contemplated contracts are for a term of twenty years.

In October and November, 2015, the plaintiffs filed separate petitions in the Supreme Judicial Court for Suffolk County pursuant to G. L. c. 25, § 5, asking that the order be set aside on the ground that it is based on an erroneous interpretation of law. A consolidated hearing was held before the single justice, who denied the motions for judgment of default and reserved and reported the matters to the full court.[13]

2. Propriety of appeal. We first consider whether this appeal is properly before us. The plaintiffs ask the court to review the department's order pursuant to G. L. c. 25, § 5, which authorizes "an appeal as to matters of law from any final decision, order or ruling." The department argues, however,

---

[13] The plaintiffs also filed motions to stay the department's order, D.P.U. 15-37 (Oct. 2, 2015) (order), which would have halted the contract review process. The motions were denied without prejudice.

that the order is not the product of an adjudicatory proceeding, nor did it adjudicate the rights of the plaintiffs; therefore, it is not appealable under § 5. See Providence & Worcester R.R. v. Energy Facilities Siting Bd., 453 Mass. 135, 140 (2009) ("A decision is 'final' for purposes of taking an immediate appeal if it completely adjudicates the rights of the parties, leaving nothing further to be decided").

We previously have held that where, as here, an agency determines that it has statutory authority to act, but has not yet exercised that authority, "such a decision is not 'final' for the purposes of judicial review under G. L. c. 25, § 5." Id. Nevertheless, we reach the merits of the question of law submitted to us by the parties because "the case has been fully briefed on the merits, . . . there is a public interest in obtaining a prompt answer to the question, and . . . the answer . . . is reasonably clear." Id., quoting Brown v. Guerrier, 390 Mass. 631, 632 (1983).[14]

3. Discussion. General Laws c. 164, § 94A, provides in relevant part that "[n]o gas or electric company shall hereafter enter into a contract for the purchase of gas or electricity covering a period in excess of one year without the approval of the department, unless such contract contains a provision

---

[14] In light of this conclusion, we do not reach the plaintiffs' argument that the order was issued in violation of the Administrative Procedure Act, G. L. c. 30A.

subjecting the price to be paid thereunder for gas or electricity to review and determination by the department in any proceeding brought under [§ 93 or 94]."

In its order, the department concluded that the plain language of § 94A provides it with the authority to review and approve "the purchase of gas or electricity" by "gas or electric companies."  D.P.U. 15-37, at 19.  It reasoned that the word "'or' . . . is used to list the entities (gas and electric companies) and the products (gas and electric purchases) and does not limit one type of company or one type of product."  Id. Rather, the department ruled that the provision grants it broad "authority over both electric and gas distribution companies, without direct limiting language."  Id.  The department further concluded that because the meaning of the statute could be discerned from the plain language, the department need not "consider legislative history or doctrines of statutory construction."  Id.  Moreover, the department found that the restructuring act did not present an impediment to electric distribution companies contracting for natural gas capacity subject to department review and approval because the framework established by the department would not result in the electric distribution companies' reentry to producing, manufacturing, or generating electricity for sale at wholesale, as contemplated by the restructuring act.  Id. at 27.  See St. 1997, c. 164, § 193.

The plaintiffs counter that this interpretation of § 94A misapprehends the rules of statutory construction and is inconsistent with the larger statutory context of c. 164, as well as legislative policymaking embodied in the restructuring act.

a.  Standard of review.  We review the validity of a policy adopted by an agency charged with implementing and enforcing State statutes under the same two-part framework used to determine whether regulations promulgated by an agency are valid.  Franklin Office Park Realty Corp. v. Commissioner of the Dep't of Envtl. Protection, 466 Mass. 454, 459-460 (2013). First, we employ "the conventional tools of statutory interpretation" to determine "whether the Legislature has spoken with certainty on the topic in question."  Goldberg v. Board of Health of Granby, 444 Mass. 627, 632–633 (2005).  Where the court determines that a statute is unambiguous, we will reject any agency interpretation that does not give effect to the Legislative intent.  Franklin Office Park Realty Corp., supra at 460.

If we conclude that "the Legislature has not directly addressed the issue and the statute is capable of more than one rational interpretation, we proceed to determine whether the agency's interpretation may be reconciled with the governing legislation" (quotation and citation omitted).  Biogen IDEC MA,

Inc. v. Treasurer & Receiver Gen., 454 Mass. 174, 187 (2009). We defer to the agency's interpretation insofar as it is reasonable. Franklin Office Park Realty Corp., 466 Mass. at 460. Statutory interpretation, however, is ultimately the duty of the courts, and the "principle of according weight to an agency's discretion . . . is one of deference, not abdication, and this court will not hesitate to overrule agency interpretations of statutes or rules when those interpretations are arbitrary or unreasonable" (quotations and citation omitted). Moot v. Department of Envtl. Protection, 448 Mass. 340, 346 (2007), S.C., 456 Mass. 309 (2010).

Our interpretation is not limited only to determining a statute's "simple, literal or strict verbal meaning" but also considers a statute's "development, [its] progression through the legislative body, the history of the times, prior legislation, contemporary customs and conditions and the system of positive law of which they are part . . . ." Kain v. Department of Envtl. Protection, 474 Mass. 278, 286 (2016), quoting Oxford v. Oxford Water Co., 391 Mass. 581, 588 (1984).

Applying these rules to the statutory language at issue, we conclude that the department erred in determining that § 94A, as amended by the restructuring act, authorizes the department to review and approve ratepayer-backed, long-term contracts for gas capacity entered into by electric distribution companies.

b. Section 94A. The parties do not dispute that § 94A has traditionally been construed by the department to apply to gas company purchases of gas and electric company purchases of electricity. Nonetheless, the department argues, nothing in the plain language of the provision prohibits the department from approving long-term contracts by electric distribution companies for gas.[15] Moreover, the department insists that because the language is unambiguous, the court need not employ the usual canons of statutory construction.

The plaintiffs ask the court to read § 94A distributively in accordance with the canon reddenda singula singulis, also known as the rule of the last antecedent, see Ross, A Rule of Last Resort: A History of the Doctrine of the Last Antecedent in the United States Supreme Court, 39 Sw. L. Rev. 325, 325

---

[15] In its order, the department provided a single basis for its authority to approve long-term gas contracts by electric distribution companies: the language of G. L. c. 164, § 94A. See D.P.U. 15-37, at 14, 17-21. See id. at 15 n.16 (expressly rejecting declining to address other potential bases for authority). On appeal, however, the department provides several other potential bases of statutory authority for its conclusion, including G. L. c. 164, §§ 69I, 76, 93, and 94. We do not specifically consider these statutory bases, as they were not relied on in the department's order, and the court will not otherwise "supply a reasoned basis for the [department's] action that the agency itself has not given" (citation omitted), NSTAR Elec. Co. v. Department of Pub. Utils., 462 Mass. at 387. We nonetheless reject the department's arguments with respect to these provisions insofar as we determine that the over-all statutory scheme of G. L. c. 164 supports the plaintiffs' interpretation of § 94A as prohibiting the type of contracts contemplated by the department's order.

(2009), which states that "[w]here a sentence contains several antecedents and several consequents, courts read them distributively and apply the words to the subjects which, by context, they seem most properly to relate."  2A N.J. Singer & S. Shambie, Statutes and Statutory Construction § 47:26 (7th ed. 2014).  Applying this canon to the text, the plaintiffs argue that the parallel uses of the word "or" in the first sentence of § 94A can be read only in a manner that authorizes the department to approve electric company contracts for the purchase of electricity, and gas company contracts for the purchase of gas.

The department argues, however, that we must disregard this maxim because the court uses aids of statutory construction only where the words of the statute are ambiguous.  This argument misapprehends the task of statutory interpretation.  The court does not determine the plain meaning of a statute in isolation, but rather concludes that a statute is unambiguous only after "consider[ing] the specific language of a statute in connection with the statute as a whole and in consideration of the surrounding text, structure, and purpose of the Massachusetts act," Custody of Victoria, 473 Mass. 64, 73 (2015), in light of the "standard rules of statutory construction and grammar" (citation omitted).  Rowley v. Massachusetts Elec. Co., 438 Mass. 798, 802 (2003).

Whether the rule of the last antecedent is characterized as a rule of construction or one of grammar, it is the type of intrinsic aid we regularly use to discern the meaning of a statute. Although application of the rule here supports the plaintiffs' reading of the statute as prohibiting the department's review and approval of gas capacity contracts by electric distribution companies, it is not dispositive, because the rule "is not an absolute and can assuredly be overcome by other indicia of meaning." Barnhart v. Thomas, 540 U.S. 20, 26 (2003).

It is true, as the department points out, that the language of § 94A does not expressly forbid it from reviewing and approving contracts by electric distribution companies for gas. Nor, however, does the language clearly permit such activity. See Entergy Nuclear Generation Co. v. Department of Envtl. Protection, 459 Mass. 319, 331 (2011) ("Where . . . the scope of agency authority is at issue, we must determine whether the agency is acting within the powers and duties expressly conferred upon it by statute and such as are reasonably necessary to carry out its mission" [quotation and citation omitted]). Thus, to the extent that "the language is not conclusive as to the Legislature's intent, we may seek guidance from the legislative history." Commonwealth v. Garrett, 473 Mass. 257, 260 (2015). Moreover, taking this history together

with the development of § 94A and its place with the larger statutory framework of G. L. c. 164, we conclude that the Legislature did not intend to authorize the department to approve the contracts contemplated in its order, but rather intended, with limited exceptions, to regulate the gas and electric utilities differently.

We begin by describing G. L. c. 164, § 94A, as it was originally enacted in 1926. The provision stated: "No electric company shall hereafter enter into a contract for the purchase of electricity covering a period in excess of three years without the approval of the department . . . ." St. 1926, c. 298. Section 94A was enacted to address concerns that newly consolidated "interlocking companies" would enter into contracts "for the interchange of electricity," and that the department might have to accept those non-arms' length transactions in later-filed electricity rate cases. See 1926 House Doc. No. 153, at 2.

Concerns remained, however, about how the expansion of holding companies and the consolidation of electric utilities under them would impact ratepayers. In light of these concerns, the Legislature created a special commission to investigate the control and conduct of public utilities in the Commonwealth. See Report of the Special Commission on Control and Conduct of Public Utilities (commission), 1930 House Doc. No. 1200, at 7

(1930 special report).  Unlike a similar report prepared in 1925 that recommended the enactment of § 94A, but did not reference gas companies in the relevant discussion, see 1926 House Doc. No. 153, at 2, the commission was instructed to investigate both electric and gas companies.  1930 special report, supra at 7-9. The special report reflects apprehensions about the consolidation of independent operating companies, and how those consolidations might unjustly increase ratepayer cost for gas and electricity.  Id. at 15-16, 34, 46-47, 52-53, 68-69, 240-241.

The report informs our understanding of the history of § 94A, as it reveals why the Legislature sought to extend St. 1926, c. 298, to gas companies:  the commission predicted that the same concerns about electric companies would arise with respect to gas companies as well.  Id. at 41-42.  Finding that St. 1926, c. 298, provided "valuable protection against excessive charges for electricity," the report recommended extending the existing statute to cover gas company contracts for the purchase of gas.  See id. at 67-68.  Importantly, the special report did not appear to contemplate gas company purchases of electricity or electric company purchases of gas. To the contrary, the text of the special report supports the plaintiffs' position that the electric and gas industries were regulated separately.  See, e.g., id. at 74 ("There is no

necessary connection between the two kinds of business"); id. at 15 n.2, citing G. L. c. 164, §§ 22, 23 ("An electric company could not deal in gas under any circumstances"). The recommended bill was enacted in May, 1930, and appears in substantially the same form today. Compare St. 1930, c. 342, with G. L. c. 164, § 94A. Following the 1930 amendment, § 94A provided: "No gas or electric company shall hereafter enter into a contract for the purchase of gas or electricity covering a period in excess of two years without the approval of the department . . ." (emphasis supplied). St. 1930, c. 342.[16]

The department and the plaintiffs offer competing interpretations of this history. The department argues that this history does not support any finding of legislative intent to restrict the commodities to be purchased by utilities, or the types of contracts that would be subject to department review, but rather only to limit the power of the holding companies that had come to dominate the gas and electric industries. Thus, in the department's view, the concerns that prompted the amendment arose from a desire to protect ratepayers from excessive rates, with no indication that the department should be limited in its

---

[16] The statute was further amended in 1941 to change the contract period from two years to one year. St. 1941, c. 400. At the time of the 1930 amendment, the Legislature had already used the "gas or electric company" or "gas or electricity" construction numerous times elsewhere in G. L. c. 164. G. L. (Ter. Ed.) c. 164 (1932), §§ 5, 11, 15-18, 30, 34, 42-43, 45-46, 55-56, 58, 60-69, 78-79, 81-84, 89, 92-96, 116-117, 124-125.

ability to review any type of commodity contract by any type of utility company.

The plaintiffs disagree, and argue that the introduction of the new language in the 1930 amendment did not alter or expand the meaning of existing and unchanged statutory language because the Legislature did not express any intent to do so. See Foster v. Group Health Inc., 444 Mass. 668, 674 (2005) ("provisions of [an] amendatory act [are] to be considered together with provisions of [the] original act"). Thus, they argue, the 1930 amendment was not made with the intent to expand electric company contracting authority to include the purchase of gas, but rather to expand the department authority to regulate gas company contracts for gas in addition to electric company contracts for electricity.

We agree, and conclude that the history and development of the statute supports the plaintiffs' distributive reading of the terms "gas or electric." In light of the history, as well as the different regulatory treatment of gas and electric utilities, it is apparent that the addition of the term "gas" to § 94A was not meant to expand the department's authority to review any type of commodity contract by any type of utility, but rather to ensure that gas companies were not free to engage in the types of transactions that might harm ratepayers when electric companies were prohibited from doing so.

Moreover, our conclusion that the Legislature intended to regulate gas and electric utilities differently is supported by other language in the statute, including the express, non-overlapping definitions of "gas company" and "electric company," even if the corporate entity engaging in one of those defined, regulated businesses is "subsequently authorized" to also perform the other function.  See G. L. c. 164, §§ 1, 8A.[17]

---

[17] General Laws c. 164, § 1, defines an electric company as follows:

"a corporation organized under the laws of the commonwealth for the purpose of making by means of water power, steam power or otherwise and for selling, transmitting, distributing, transmitting and selling, or distributing and selling, electricity within the commonwealth, or authorized by special act so to do, even though subsequently authorized to make or sell gas; provided, however, that electric company shall not mean an alternative energy producer; provided further, that a distribution company shall not include an entity which owns or operates a plant or equipment used to produce electricity, steam and chilled water, or an affiliate engaged solely in the provision of such electricity, steam and chilled water, where the electricity produced by such entity or its affiliate is primarily for the benefit of hospitals and nonprofit educational institutions, and where such plant or equipment was in operation before January 1, 1986; and provided further, that electric company shall not mean a corporation only transmitting and selling, or only transmitting, electricity unless such corporation is affiliated with an electric company organized under the laws of the commonwealth for the purpose of distributing and selling, or distributing only, electricity within the commonwealth."

A gas company is defined as "a corporation organized for the purpose of making and selling or distributing and selling, gas within the commonwealth, even though subsequently authorized to make or sell electricity; provided, however, that gas company shall not mean an alternative energy producer."  Id.

Indeed, the department's own order acknowledges the "different regulatory treatment of a [local distribution gas company] and [electric distribution companies]."  D.P.U. 15-37, at 43.

The larger statutory context in which the term "gas or electric" is used extensively in G. L. c. 164 is also instructive.  For example, G. L. c. 164, § 116, gives a duly authorized officer or employee of "a <u>gas or electric</u> company . . . [the right to] enter any premises supplied with <u>gas or electricity</u> by such company for the purpose of examining or removing the meters, pipes, wires, fittings and works for supplying or regulating the supply of <u>gas or electricity</u> and of ascertaining the quantity of <u>gas or electricity</u> consumed or supplied" (emphasis added).  In an emergency, fire and police officers must allow such an authorized representative "of a <u>gas or electric company</u> . . . to enter any area or building in order to shut off the <u>gas or electricity</u>, which is or may become a source of danger to the public" (emphasis added).  G. L. c. 164, § 116A.  See G. L. c. 164, § 93 (granting department authority, on notice and investigation following written complaint "either as to the quality or price of the <u>gas or electricity</u> sold and delivered, . . . [to] order any reduction or change in the price or prices of <u>gas or electricity</u> or an improvement in the quality thereof" [emphasis added]); G. L. c. 164, § 76A (department has authority to supervise affiliate of both gas and electric

companies with respect to extent of their activities that "affect the operations of" any gas or electric company they are affiliated with, directing that "[s]uch relations, transactions and dealings, including any payments by a gas or electric company to such an affiliated company for services or materials and supplies which enter into the manufacture, distribution or sale of gas or electricity, shall be subject to review and investigation by the department in any proceeding brought under [G. L. c. 164, §§ 93-94]" [emphasis added]).

The department, however, argues that reading the words "gas or electricity" distributively throughout G. L. c. 164 would lead to absurd results that could not have been intended by the Legislature. The department notes that it may authorize an electric company to "engage in the business of a gas company" and a gas company "to engage in the business of an electric company" if it "deems the public convenience will be promoted thereby" pursuant to G. L. c. 164, § 8A. Thus, the department argues, if the court were to adopt the distributive reading of c. 164 suggested by the plaintiffs, a gas company authorized to engage in the sale of electricity pursuant to G. L. c. 164, § 8A, for example, would not be required to report accidents caused by electricity it supplied where someone was killed (see G. L. c. 164, § 95); would be unable to enter any area or building to shut off electricity which is or may become a source

of danger to the public (see G. L. c. 164, § 116A); and would be unable to stop service to a person who failed to pay his or her electricity bill (see G. L. c. 164, § 124).

These arguments are not persuasive. The "absurdities" identified by the department are easily resolved by consistently treating "gas companies" and "electric companies" separately throughout c. 164, as required by their statutory definitions. Moreover, if a gas company were to amend its corporate charter and obtain approval from the department under G. L. c. 164, § 8A, to also engage in the business of an electric company, as the department hypothesizes, it would plainly also meet the statutory definition of "electric company" pursuant to G. L. c. 164, § 1, and so would expressly be subject to the statutory provisions cited to by the department.

A final factor supports our conclusion that the Legislature did not intend to authorize the department to approve electric distribution company contracts for gas capacity and vice versa. Although we defer to an agency's reasonable interpretation of a statute it is charged with enforcing, "[t]he appropriate weight (of such interpretation), in a particular case, will depend on a variety of factors, including whether the agency participated in the drafting of the legislation . . . , whether the interpretation dates from the enactment of the legislation, and whether it has been consistently applied" (citations

omitted).  Board of Educ. v. Assessor of Worcester, 368 Mass. 511, 515-516 (1975).

In this case, we have not located (nor has the department identified) any instance of the department approving, pursuant to § 94A, a contract for electricity by a gas company, or a contract for gas by an electric company in the eighty-six year period since the 1930 amendment.  Moreover, before issuing the order, the department had never interpreted § 94A to authorize its approval of such contracts; to the contrary, its prior orders suggest that the department also had adopted a distributive construction of the statute's language with the term gas relating to gas companies and the term electricity relating to electric companies.  See, e.g., D.P.U. 95-67, at 21 (Oct. 10, 1995) ("G. L. c. 164, § 94A, requires gas and electric companies to file for [d]epartment approval all contracts for the purchase of gas or electricity of a duration greater than a year" [emphasis added]); D.T.E. 02-50, at 2 (Sept. 23, 2002) (same); D.P.U. 86-247, at 7 (Dec. 4, 1987) ("Under [§] 94A, any electric company who contracts for the purchase of electricity for a period in excess of one year must submit the contract for review").  The department's order here thus represents a significant departure from its own history of administering

§ 94A and its separate treatment of the gas and electric utilities.[18]

In light of these considerations, we conclude that the department erred in interpreting § 94A as authorizing it to review and approve ratepayer-backed, long-term contracts by electric distribution companies for gas capacity (or contracts by gas companies).

c.  Restructuring act of 1997.  We further conclude that the department's interpretation of § 94A is untenable in light of the 1997 restructuring act, which amended G. L. c. 164 ("An Act relative to restructuring the electric utility industry in the Commonwealth, regulating the provision of electricity and other services, and promoting enhanced consumer protections therein").  "Any judicial review of agency action embodies the principle that an agency has no inherent authority beyond its enabling act and therefore it may do nothing that contradicts such legislation."  Globe Newspaper Co. v. Beacon Hill Architectural Comm'n, 421 Mass. 570, 586 (1996).  For the

---

[18] See also 220 Code Mass. Regs. §§ 11.00 (2016) (department's rules governing restructuring of electric industry silent as to whether restructured electric distribution company being able to purchase gas or be compensated therefor); D.P.U. 94-174-A, at 1-2 (Mar. 15, 1994) (in designing and establishing "single standard based on the public interest" to be applied to all gas commodity contracts -- for both the gas itself, and for the pipeline capacity necessary to transport it -- the department entertained comments only from, included analysis only regarding, and designed the standard only for, gas companies).

reasons discussed herein, we determine that the department's approval of ratepayer-backed, long-term contracts by electric distribution companies for gas capacity contradicts the fundamental policy embodied in the restructuring act, namely the Legislature's decision to remove electric distribution companies from the business of electric generation.

Prior to the passage of the restructuring act, electric companies were vertically integrated monopolies, controlling the generation, transmission, and distribution of electricity. See Northeast Energy Partners, LLC v. Mahar Regional Sch. Dist., 462 Mass. 687, 695 (2012). Recognizing that "the interests of consumers [could] best be served by an expedient and orderly transition from regulation to competition in the generation sector consisting of the unbundling of prices and services and the functional separation of generation services from transmission and distribution services," St. 1997, c. 164, § 1 (m), the Legislature enacted the act to separate these three utility services and open the supply of generation services to competition. Northeast Energy Partners, LLC, supra at 696-697. This functional separation of services, which limited a "'company's ability to provide itself an undue advantage in buying or selling services in competitive markets,' was regarded as a necessary first step in moving toward 'a fully competitive

generation market based on customer choice.'"  Id. at 697,
quoting D.P.U. 95-30, at 16 (Aug. 16, 1995).

The restructuring act also removed "the business of
producing, manufacturing, or generating electricity," from the
department's supervisory authority.  See St. 1997, c. 164,
§§ 189, 193.  Following the transfer by Commonwealth utilities
of all generation facilities to separate ownership, no portion
of the business of a generating company could "be subject to
regulation as a public utility or as an electric company."  St.
1997, c. 164, § 193; G. L. c. 164, § 1A (e).

Additionally, by deregulating the generation component of
the electric utility industry, electric distribution companies
were discharged from their duties to plan for, build, and
operate or profit from the making and selling of electricity.
Instead, the business of electric distribution companies is to
plan for, build, and operate distribution infrastructure (e.g.,
poles, wires, and substations); deliver electricity; and be
compensated for doing so.  See, e.g, G. L. c. 164, § 1, inserted
by St. 1997, c. 164, § 187 (defining "[d]istribution company,"
"[d]istribution service," and "[d]istribution facility").

Recognizing the circumscribed role of electric distribution
companies after the restructuring act, the department exempted
them from their prerestructuring act business obligations
relating to fuel management and power planning.  First, in 1998,

the department acknowledged that the electric distribution companies would no longer be buying fuel for power plants or recovering from ratepayers the cost of fuel. Accordingly, the department exempted electric distribution companies from the previous fuel procurement and cost recovery program under G. L. c. 164, § 94G. D.T.E. 98-13, at 4 (Feb. 20, 1998).[19]

The department also exempted electric distribution companies from G. L. c. 164, § 69I, which had imposed a power planning requirement on the electric utilities, and instead directed distribution companies to focus exclusively on distribution. D.T.E. 98-84, at 1-2 (Aug. 10, 1998). Section 69I had required electric companies to assess expected customer electricity demand over a ten-year period and ensure that they would have the right fuel and infrastructure mixture to serve that expected demand.[20] In exempting electric distribution

---

[19] As relevant here, G. L. c. 164, § 94G, required companies to demonstrate to the department that their plans to procure fuel for their power plants would "maintain sufficient reserves of power for purposes of reliability and efficiency." G. L. c. 164, § 94G (a). Section 94G (a) also allowed electric companies to recover their fuel costs from customers and adjust the rate based on fluctuations in fuel prices. See generally Consumers Organization for Fair Energy Equality, Inc. v. Department of Pub. Utils., 368 Mass. 599, 601-602 (1975).

[20] In relevant part, G. L. c. 164, § 69I, required that electric companies file biennial forecasts of the electric power needs and requirements of its market area for the ensuing ten-year period. D.T.E. 98-84/EFSB 98-5, at 1 (Aug. 8, 2003). Prior to the restructuring act, the department used this device to regulate electric companies' "procurement of and cost

companies from § 69I, the department recognized that the restructuring act relieved such companies from their obligation to "forecast[], plan[], solicit[] and procur[e] long-term electricity supplies for their customers." D.T.E. 98-84, at 1 (Aug. 10, 1998).

Thus, the department's exemption of electric distribution companies from both §§ 94G and 69I signaled its recognition that electric distribution companies were leaving all aspects of the generation business, including not only power plant construction, but also the planning and fuel management aspects of generation.

Moreover, in restructuring the electric industry by removing electric distribution companies from the business of electric generation, the Legislature "shifted the risks of generation development from consumers to generators" to "insulate[] [consumers] from construction, operational, and price risks . . . inherent in commodity rate regulation." D.P.U. 12-77, at 28 (Mar. 15, 2013). See D.T.E. 98-84, at 2 (Aug. 10, 1998) ("A market framework based on competition . . . will mean that the economic consequences of building too many power plants will be borne directly by investors, rather than ratepayers"). Through the restructuring act, the Legislature

recovery associated with . . . resources to meet [their customers' electricity needs." Id.

sought to shift such risk away from ratepayers, who had been forced to pay higher rates for electricity as a result of "excessive investments" in expensive and poorly managed long-lived infrastructure projects.  Black & Pierce, The Choice Between Markets and Central Planning in Regulating the U.S. Electricity Industry, 93 Colum. L. Rev. 1339, 1344-1345, 1386 (1993).[21]

In this case, the department's interpretation of § 94A not only would permit electric distribution companies to purchase resources related to supply of electric generation (in this case, natural gas capacity), but also would allow the department to regulate such activity and to shift the associated costs to ratepayers.  We agree with the plaintiffs that such activity would undermine the main object to be accomplished by the restructuring act, i.e., to move from a regulated electricity supply market to an open and competitive market for power.  See St. 1997, c. 164, § 1 (f).  Further, an interpretation of § 94A

---

[21] See, e.g., Attorney Gen. v. Department of Pub. Utils., 390 Mass. 208, 219, 222, 228-229 (1983) (affirming department decision that authorized electric company to recover, through increased rates, costs it incurred in later abandoned Pilgrim II nuclear power plant).  See also Norwood v. Federal Energy Regulatory Comm'n, 80 F.3d 526, 530-531 (D.C. Cir. 1996) (affirming, in part, FERC decision to allow nuclear plant operator to recover costs for prematurely closed nuclear plant based in Rowe, Massachusetts); Cost of Seabrook Plant Begins to Hit Customers, N.Y. Times, Feb. 1, 1987 (describing Massachusetts ratepayer costs associated with construction of Seabrook nuclear power plant).

that includes approval of pipeline capacity contracts by electric distribution companies would contradict the specific statutory provisions put in place under G. L. c. 164 to account for the divestiture of all generation assets by electric distribution companies.  See, e.g., G. L. c. 164, § 1G.  Accordingly, this interpretation would give rise to an inconsistent body of regulatory law.  See D.T.E. 98-84/EFSB 98-5 (exempting electric distribution companies from G. L. c. 164, § 69I, and rescinding 220 Code Mass. Regs. §§ 10.00); D.T.E. 98-13 (exempting electric distribution companies from G. L. c. 164, § 94G).

Perhaps most importantly, however, the department's order would reexpose ratepayers to the very types of risks that the Legislature sought to protect them from when it enacted the restructuring act.  Both the DOER and the department noted that gas-fired generating businesses are unwilling to assume the risks associated with long-term gas pipeline capacity contracts because there "is no means by which they can" assure recovery of those contract costs.  Shifting that risk onto the electric ratepayers of the Commonwealth, however, is entirely contrary to the risk-allocation design of the restructuring act.

Equally unavailing is the department's finding that the order does not contravene the policy embodied in the restructuring act because it does not allow the use of ratepayer

funds to construct a power plant.  D.P.U. 15-37, at 27.  As prior decisions by this court and the department make clear, power plant construction is only one aspect of the electric generation market, and in enacting the restructuring act, the Legislature sought to separate all aspects of generation from all aspects of distribution.  See, e.g., D.T.E. 98-13, at 4; D.T.E. 98-84, at 1.

Moreover, the department itself has recognized that fuel procurement and planning is an integral component of the generation business, as evidenced by its exemption of electric distribution companies from § 69I.  Indeed, by some estimations, fuel-related costs constitute seventy-five per cent of a natural gas-fired plant's generation costs.  3 World Scientific Handbook of Energy 72 (G.M. Crawley ed., 2013).  Accordingly, prior to the enactment of the restructuring act, the department required electric companies to consider both the type and amount of fuel they would use to generate power when they calculated whether they could supply enough electricity to match expected demand. We agree with the plaintiffs that if the restructuring act does not allow electric distribution companies to finance investments in electric generation, it cannot be reasonably interpreted to permit those companies to invest in infrastructure unrelated to electric distribution service.  Accordingly, we reject the department's reasoning.  See Cardin v. Royal Ins. Co. of Am.,

394 Mass. 450, 456-557 (1985) (agency's interpretation of statute "hardly persuasive where [it] violates the language and policy of the statute," [quotation and citation omitted]).

The department's interpretation of the statute as permitting electric distribution companies to shift the entire risk of the investment to the ratepayers is unreasonable, as it is precisely this type of shift that the Legislature sought to preclude through the restructuring act. Contrast D.P.U. 12-77, at 28 (Mar. 15, 2013) ("The legislation restructured the electric industry in the state by providing incentives to investor-owned electric distribution companies to divest their generating assets and by adopting a competitive market structure for the generation and purchase of electricity. This restructuring shifted the risks of generation development from consumers to generators, who are better positioned to manage those risks").

Our interpretation of the restructuring act is supported by the Legislature's own actions since the law's enactment. That is, where the Legislature has sought to override the risk allocation policy of the act, it has done so expressly. First, in 2008, through enactment of the Green Communities Act, St. 2008, c. 169, the Legislature directed electric distribution companies to seek proposals from renewable energy developers, and, if they received reasonable proposals, to enter into

ratepayer-backed long-term contracts to buy the renewable power. See St. 2008, c. 169, § 83. The Legislature concluded that such contracts were necessary to "facilitate the financing of renewable energy generation facilities." Alliance to Protect Nantucket Sound, Inc. v. Department of Pub. Utils. (No. 1), 461 Mass. 166, 168 (2011). Importantly, in enacting the Green Communities Act, the Legislature explicitly provided the department with the authority to review and approve the ratepayer-backed renewable energy contracts. St. 2008, c. 169, § 83 ("[a]ll proposed contracts shall be subject to the review and approval of the department of public utilities").

The Green Communities Act represents a legislatively created exception to the restructuring act's general prohibition on electric distribution companies owning generation assets. To facilitate promotion of renewable energy in the Commonwealth, the Legislature allowed each distribution company to construct, own, and operate twenty-five megawatts of solar energy before January 1, 2009, and 50 megawatts after January 1, 2010. St. 2008, c. 169, § 58. Section 58 further provided that an electric distribution company had to obtain prior approval for cost recovery from the department in order to recover construction costs of a solar generation facility. Id. Although the statute has since been amended, it continues to

provide an express, limited exemption from the restructuring act.  See St. 2012, c. 209, § 17.

Second, in 2012, the Legislature enacted "An Act relative to competitively priced electricity," in which it authorized the department to order electric distribution companies in the Northeastern Massachusetts/Boston load zone (NEMA) to solicit proposals for electricity generation, and if they received reasonable proposals, to enter into ratepayer-backed long-term contracts to buy the generation for use in the NEMA load zone. St. 2012, c. 209, § 40.  This provision explicitly permitted the department to review and approve any resulting contracts if the department determined that they were justified.  Id.

These actions by the Legislature represent a clear decision to depart from the policy choice to remove electric distribution companies from the business of generation, as expressed in the restructuring act, in very specific circumstances.  Here, the department's stated motive in issuing the order is to correct a perceived failure of market-based incentives to encourage wholesale generators to contract for adequate pipeline capacity. However, its means of doing so, namely by reallocating risk onto the ratepayers, is clearly prohibited by legislative policy. Thus, no matter how salutary the department may claim its policy aims to be, its order contravenes the fundamental policy embodied in the restructuring act and cannot stand.  See Utility

Air Regulatory Group v. Environmental Protection Agency, 134 S. Ct. 2427, 2446 (2014) (agency authority to interpret ambiguities in enabling statute "does not include a power to rewrite clear statutory terms to suit its own sense of how the statute should operate"); Wakefield Teachers Ass'n v. School Comm. of Wakefield, 431 Mass. 792, 802 (2000) (fundamental policy decisions are province of Legislature, and not coordinate branches of government).

4. Conclusion. We conclude that the department erred in interpreting G. L. c. 164, § 94A, as amended by the 1997 restructuring act, as authorizing it to review and approve ratepayer-backed, long-term contracts by electric distribution companies for natural gas capacity. Accordingly, the department's order is vacated.

So ordered.