NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12207

PEOPLE FOR THE ETHICAL TREATMENT OF ANIMALS, INC. vs. DEPARTMENT OF AGRICULTURAL RESOURCES & another.[1]

Suffolk.     February 6, 2017. - June 14, 2017.

Present: Gants, C.J., Lenk, Gaziano, Lowy, & Budd, JJ.

Public Records. Agriculture. Animal. Statute, Construction. Privacy.

Civil action commenced in the Superior Court Department on October 14, 2014.

The case was heard by Christopher J. Muse, J.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

David Milton for the plaintiff.
Amy Spector, Assistant Attorney General, for the defendants.
Laura Rótolo & Jessie Rossman, for American Civil Liberties Union of Massachusetts, amicus curiae, submitted a brief.
Jessica White, for Prisoners' Legal Services of Massachusetts, amicus curiae, submitted a brief.

---

[1] Commissioner of the Department of Agricultural Resources.

LENK, J.  This case concerns the scope of two exemptions from the statutory definition of "public records." Specifically, it probes whether information, such as names, addresses, telephone numbers, and other information, contained on animal health certificates in the custody of the Department of Agricultural Resources, is subject to disclosure in response to a public records request.  A Superior Court judge determined that such information is protected from disclosure under statutory exemptions G. L. c. 4, § 7, Twenty-sixth (n) and (c), implicating, respectively, public safety and privacy.  For the reasons that follow, we vacate that order and remand for further proceedings consistent with this opinion.[2]

Background.  1.  Public records framework.  At all times relevant to this case, two statutes governed access to public records:  G. L. c. 66, § 10, and G. L. c. 4, § 7, Twenty-sixth.[3]

---

[2] We acknowledge the amicus briefs of the American Civil Liberties Union of Massachusetts and Prisoners' Legal Services of Massachusetts.

[3] Since the entry of judgment in this case, G. L. c. 66, § 10, has been substantially revised, with the changes taking effect on January 1, 2017.  Compare G. L. c. 66, § 10, as amended by St. 2010, c. 256, §§ 58-59, with G. L. c. 66, §§ 10, 10A, as amended by St. 2016, c. 121.  General Laws c. 4, § 7, Twenty-sixth (n) (exemption [n]), also has been revised, albeit in a less substantial way.  See St. 2016, c. 121, §§ 1-3 (inserting phrase "cyber security" into exemption [n]).  This opinion refers to the versions of G. L. c. 66, § 10, and G. L. c. 4, § 7, that existed through 2015, the time period relevant to the adjudication of the plaintiff's public records request.

General Laws c. 66, § 10, sets forth the conditions under which government entities, through their records custodians, must provide access to public records. "The primary purpose of G. L. c. 66, § 10, is to give the public broad access to governmental records." Worcester Tel. & Gazette Corp. v. Chief of Police of Worcester, 436 Mass. 378, 382-383 (2002).

The term "public records," in turn, is defined by G. L. c. 4, § 7, Twenty-sixth. The definition sweeps in a wide array of documents and data made or received by employees, agencies, or other instrumentalities of the Commonwealth. See Hull Mun. Lighting Plant v. Massachusetts Mun. Wholesale Elec. Co., 414 Mass. 609, 614 (1993), citing G. L. c. 4, § 7, Twenty-sixth (1990 ed.). This expansive definition of "public records" is statutorily limited by twenty enumerated exemptions in G. L. c. 4, § 7, Twenty-sixth (a)-(u).

Together, these statutes, and our cases interpreting them, favor disclosure of public records in two primary ways. First, G. L. c. 66, § 10, imposes a presumption that the record sought is public and places the burden on the records custodian to "prove with specificity" that an exemption applies. G. L. c. 66, § 10 (c). To that end, "a case-by-case review is

Although not raised by the parties and while the point need not be settled today, it appears that, going forward, such revisions would not significantly alter our analysis as to the exemptions and their application.

required to determine whether an exemption applies." Matter of a Subpoena Duces Tecum, 445 Mass. 685, 688 (2006). Second, the statutory exemptions in G. L. c. 4, § 7, Twenty-sixth, are to be "strictly construed." Hull Mun. Lighting Plant, 414 Mass. at 614.

The two statutory exemptions at issue in this case are found in subsections (n) (exemption [n]) and (c) (exemption [c]) of G. L. c. 4, § 7, Twenty-sixth. Exemption (n) concerns records related to public safety. Specifically, it allows a records custodian to withhold an otherwise public record if the record is sufficiently related to the safety or security of persons or infrastructure, and if disclosure of the record, in the "reasonable judgment of the record custodian," is "likely to jeopardize public safety." G. L. c. 4, § 7, Twenty-sixth (n).

Exemption (c) concerns records related to privacy. It permits a records custodian to withhold an otherwise public record if it is a personnel or medical file, or if it relates to a specifically named individual and its disclosure may constitute an unwarranted invasion of personal privacy. G. L. c. 4, § 7, Twenty-sixth (c).

These two exemptions share a common characteristic in that they both require consideration of the likely consequences of releasing the record sought. Exemption (n), however, is unique among the statutory public records exemptions in including the

"reasonable judgment of the record custodian" as part of the calculation.  See generally G. L. c. 4, § 7, Twenty-sixth.

2.  <u>Facts</u>.  In February, 2014, People for the Ethical Treatment of Animals, Inc. (PETA), submitted two requests under G. L. c. 66, § 10, to the Department of Agricultural Resources (department).  The first sought access to "any and all permits, licenses, health certificates, and other documentation related to the export and/or import of nonhuman primates in Massachusetts during 2013."  The second sought access to "all records referencing, reflecting, or relating to alleged or claimed safety risks posed to animals (including but not limited to nonhuman primates), people and buildings involved with housing and transporting non-human primates."

The department responded in April, 2014.  With respect to the first request, the department provided copies of eleven pages of interstate health certificates for nonhuman primates. The department redacted from the certificates three categories of information:  (1) the names and addresses of consignors and consignees, (2) United States Department of Agriculture license or registration numbers, and (3) the names, addresses, telephone numbers, and license numbers of all veterinarians whose

information appeared on the health certificates.[4]  The department expressed its view that disclosing such information "could compromise the security of locations housing non-human primates, thus increasing the risk to public safety of the animals as well as the people and buildings involved with housing and transporting the animals."  As a result, the department believed the information was exempt from the definition of "public records" pursuant to exemption (n).

The department's response also referenced, and provided a copy of, a 2013 memorandum from the United States Department of Veterans Affairs (VA memorandum).  In the VA memorandum, the Freedom of Information Act (FOIA) Office of the Veterans Health Administration advised its FOIA field officers "not to release any personal information" about "personnel engaged in any way in animal research in response to requests for that information."

With respect to PETA's second request, the department stated that it did not have any records regarding alleged or claimed safety risks posed to animals, people, or buildings involved with the housing and transport of nonhuman primates.

PETA appealed from the department's response to the supervisor of public records, pursuant to G. L. c. 66, § 10 (b).

---

[4] Although not specified in this initial response, the Department of Agricultural Resources (department) later asserted that the redacted information encompassed information pertaining to both facilities and specifically named individuals.

In June, 2014, the supervisor of public records resolved the appeal in the department's favor, noting its reliance on the VA memorandum and upholding its redactions.  The supervisor of public records stated that "[a]lthough the FOIA exemptions cited in the [VA] memorandum are not available to the [d]epartment as a means of responding to [PETA's] request, the manner in which this information is treated by the [F]ederal government is persuasive when examining the [d]epartment's [e]xemption (n) claim."

3.  Procedural history.  In October, 2014, PETA filed a complaint in the Superior Court challenging the department's redactions and seeking injunctive and declaratory relief, per G. L. c. 66, § 10 (b).  In essence, the complaint alleged that the department had failed to meet its burden of showing that the sole exemption it relied on in making the redactions -- exemption (n) -- applied to the redacted information, and therefore that the department's refusal to provide unredacted copies of the health certificates violated G. L. c. 66, § 10.

After answering the complaint, the department filed an emergency motion for a protective order to stay discovery.  The department argued that discovery was unnecessary because it had relied on only three documents in determining that exemption (n) applied:  (1) the VA memorandum, discussed supra; (2) a 2013 decision of the supervisor of public records applying exemption

(n) to an earlier, similar public records request from PETA; and (3) a 2013 memorandum from the department's legal division explaining its view that exemption (n), as well as the privacy exemption under FOIA, 5 U.S.C. § 552(b)(6) (2012), authorized the withholding of much, but not all, of the information redacted from PETA's 2014 request.[5]  PETA opposed the motion, arguing primarily that exemption (n) requires a fact-intensive inquiry that justified its discovery requests.  After a hearing, the Superior Court judge deferred ruling on the motion in order to allow the department to file a "comprehensive statement in support of its reasons" for claiming that exemption (n) applied, as well as an anticipated dispositive motion.

The department then filed a memorandum in support of its motion.  In it, the department argued that it properly relied on exemption (n) in redacting the information described above.  It also argued, for the first time, that exemption (c) authorized the redaction of names, addresses, and telephone numbers pertaining to individuals (as opposed to facilities), which also appeared on the health certificates.  PETA argued in opposition that neither exemption applied.  Both sides attached numerous exhibits to their memoranda.

---

[5] Specifically, this memorandum expressed the view that the name, address, and telephone number of the consignor "can be disclosed" under State and Federal law.  With respect to PETA's 2014 request, however, such information was redacted.

After another hearing, the judge ruled largely in the department's favor. He determined that because exemption (n) includes such "deferential language" as "reasonable judgment" and "likely to jeopardize public safety," it required the court to give "a heightened level of deference to the keeper and supervisor of public records." Thus, based on the VA memorandum and other documents submitted by the department, the judge concluded that the department had demonstrated with sufficient specificity that, in the department's reasonable judgment, release of information on the health certificates pertaining to "persons and facilities located in the Commonwealth" was likely to jeopardize public safety, and therefore was protected under exemption (n).[6] Further, the judge concluded that the names, addresses, and telephone numbers identifying individual persons as consignees, consignors, or veterinarians are protected from disclosure under exemption (c).[7]

---

[6] The judge also concluded that similar information related to persons and facilities located outside of Massachusetts was not protected by exemption (n). Neither party appeals from this component of the judgment. Therefore, we do not review it.

[7] The decision below does not discuss whether other information redacted from the certificates, such as license numbers, accreditation numbers, permit numbers, and premises identification numbers, fall within the scope of the claimed exemptions. Nor do the parties discuss those pieces of information in their briefs. Accordingly, we do not address them here.

PETA appealed, and we transferred the case to this court on our own motion.

Discussion.  It is uncontested that the animal health certificates that PETA requested fall within the general definition of "public records."  Thus, despite its unusual procedural background,[8] this appeal turns on two questions of statutory construction:  the scope of exemptions (n) and (c).[9] We exercise de novo review of such questions.  See Monell v. Boston Pads, LLC, 471 Mass. 566, 569-570 (2015).

1.  Exemption (n).  Exemption (n) contemplates the withholding of:

> "records, including, but not limited to, blueprints, plans, policies, procedures and schematic drawings, which relate to internal layout and structural elements, security measures, emergency preparedness, threat or vulnerability assessments, or any other records relating to the security

_____

[8] Primarily, this appeal requires us to review the grant of judgment to the department.  It is unclear on the record before us precisely which rule of the Massachusetts Rules of Civil Procedure the judge relied upon in granting judgment to the department.  Even assuming, as the parties urge, that the judge effectively granted summary judgment to the department, our approach would be the same because, given our interpretation today of the scope of exemptions (n) and (c), it cannot be said that "the moving party is entitled to judgment as a matter of law" (citation omitted).  Massachusetts Insurers Insolvency Fund v. Smith, 458 Mass. 561, 564 (2010).

[9] PETA also argues that the judge abused his discretion by entering judgment in the department's favor without permitting PETA further development of the factual record through discovery.  On remand, the judge should consider whether additional discovery may be necessary or appropriate in light of the scope of the relevant exemptions discussed in this opinion.

or safety of persons or buildings, structures, facilities, utilities, transportation or other infrastructure located within the commonwealth, the disclosure of which, in the reasonable judgment of the record custodian, subject to review by the supervisor of public records under [G. L. c. 66, § 10 (b)], is likely to jeopardize public safety."

G. L. c. 4, § 7, Twenty-sixth (n).

The parties essentially agree that applying this exemption requires a two-part analysis. First, it requires a threshold determination concerning the nature of the requested record. Id. Second, it requires the records custodian to exercise "reasonable judgment" in determining that disclosure of the requested record is "likely to jeopardize public safety." Id.

That being said, however, the parties disagree as to precisely what these two components mean, the relationship between them, and whether they were satisfied in this case. In particular, they disagree about whether the animal health certificates that PETA requested are swept within the scope of the exemption by the "any other records" clause. Further, they disagree about what constitutes "reasonable judgment" in predicting "jeopard[y] [to] public safety," terms that are not defined in the statute.

Construing the scope of exemption (n) appears to be a question of first impression for this court. "Our primary duty is to interpret a statute in accordance with the intent of the Legislature." Pyle v. School Comm. of S. Hadley, 423 Mass. 283,

285 (1996). Discerning the intent of the Legislature with respect to exemption (n) requires us to examine the plain meaning of the statutory language, and to draw upon the canons of construction known as noscitur a sociis ("it is known by its associates") and ejusdem generis ("of the same kind or class"), as well as the legislative history of the enactment. See Black's Law Dictionary 631, 1224 (10th ed. 2014).

We begin by examining the plain meaning of the statutory language, for if that language is "clear and unambiguous, it is conclusive as to the intent of the Legislature." Deutsche Bank Nat'l Trust Co. v. Fitchburg Capital, LLC, 471 Mass. 248, 253 (2015). Upon examining the language of exemption (n), however, it is immediately apparent that the language is neither clear nor unambiguous as to the scope of the exemption.

With respect to the first part of exemption (n), we confront a general term ("records"), followed by a nonexhaustive list of specific examples, followed by the general phrase "or any other records relating to the security or safety of persons or buildings." G. L. c. 4, § 7, Twenty-sixth (n). As the department points out, if we focus too closely on the listed examples, we risk giving too little weight to the Legislature's decision to include the "any other records" clause, thereby improperly narrowing the scope of exemption (n). On the other hand, as PETA points out, if we focus too closely on the breadth

suggested by the "any other records" clause, we risk giving too little weight to the list of examples that the Legislature saw fit to include, thereby improperly expanding exemption (n) beyond what the Legislature intended. The latter approach also would contravene our usual practice of interpreting exemptions to the public records laws narrowly. See Hull Mun. Lighting Plant, 414 Mass. at 614. With respect to the second part of exemption (n), the language of the statute offers no specific guidance as to what the Legislature intended by the phrases "reasonable judgment" and "likely to jeopardize public safety." G. L. c. 4, § 7, Twenty-sixth (n).

When faced with a similar interpretive issue in the past, we have, on occasion, applied the canon of noscitur a sociis, which counsels that "ordinarily the coupling of words denotes an intention that they should be understood in the same general sense." Commonwealth v. Hamilton, 459 Mass. 422, 432 (2011), quoting 2A N.J. Singer, Sutherland Statutory Construction § 47:16, at 352-353 (7th ed. 2007). In other words,

> "[a] general term in a statute or ordinance takes meaning from the setting in which it is employed. The literal meaning of a general term in an enactment must be limited so as not to include matters that, although within the letter of the enactment, do not fairly come within its spirit and intent."

Kenney v. Building Comm'r of Melrose, 315 Mass. 291, 295 (1943). We also have applied a close relative of this doctrine known as

ejusdem generis.  See Banushi v. Dorfman, 438 Mass. 242, 244 (2002).  This canon counsels that "[w]here general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  Id., quoting 2A N.J. Singer, Sutherland Statutory Construction § 47:17, at 273-274 (6th ed. 2000).

Applying those canons here suggests a narrow interpretation of exemption (n).  In particular, they caution against interpreting the general language regarding "any other records relating to the security or safety of persons or buildings" as enlarging the scope of the statute beyond the legislative raison d'etre evinced by the enumerated list of examples.  In other words, while the class of records that may qualify for exemption (n) is open, and not closed, we must interpret the "any other records" clause as embracing only those records that, when released, are "likely to jeopardize public safety" in a similar way to one of the examples listed in exemption (n).

Where, as here, the language of a statute itself is not conclusive as to the Legislature's intent, we also may seek guidance from the legislative history.  ENGIE Gas & LNG LLC v. Department of Pub. Utils., 475 Mass. 191, 199-200 (2016).  Much of that history further supports a narrow interpretation of exemption (n).

Exemption (n) was enacted as one of twelve sections in "An Act providing protections against terrorism" (act). See St. 2002, c. 313. That title speaks for itself in terms of the Legislature's thinking at the time it adopted exemption (n). Its thrust is reinforced by other contextual clues, including the timing of the enactment and contemporaneous media coverage. Specifically, the act was passed by the Legislature and signed into law in September, 2002 -- the one-year anniversary of the September 11, 2001, attacks on the World Trade Center and the Pentagon. See Anti-Terror Bill Sent to [then Acting Governor Jane M.] Swift's Desk, State House News Service, Sept. 3, 2002; Swift Signs Anti-Terrorism Legislation, Executive Department Press Release, Sept. 10, 2002.

The preenactment history behind exemption (n) corroborates the notion that protecting the public from terrorist attacks in a post-September 11, 2001, world was the animating principle underlying its adoption. Exemption (n) was proposed by Acting Governor Swift. See Letter from Acting Governor Swift to Senate and House of Representatives, June 26, 2002. The letter makes clear that the acting Governor believed that such an exemption was necessary following the events of September 11, 2001. Id. She described the legislation as "carv[ing] out a very narrow exemption to the definition of public records for those materials pertaining to public safety including threat

assessments, security plans and certain records depicting critical infrastructure." Id.  The letter indicates that the acting Governor had in mind "certain records pertaining to state and local government's ability to protect its resources as well as other sensitive infrastructure" and hoped to "encourage private industries to share sensitive information regarding their respective security plans with law enforcement without the risk of automatic public disclosure." Id.  Similarly, the Executive Office of Public Safety described exemption (n) as encompassing records of "the type that terrorists would find useful to maximize damage, such as threat assessments, security plans and structural documents depicting critical infrastructure."[10]  Memorandum, Executive Office of Public Safety, September 5, 2002 (EOPS Memorandum).

Given this legislative history and the canons of statutory construction operative here, we conclude that the following construction of exemption (n) strikes the appropriate balance.

_____

[10] The Legislature's only substantive change to the language that Acting Governor Swift proposed for exemption (n) was to modify the "reasonable judgment of the record custodian" by adding the phrase "subject to review by the supervisor of public records [G. L. c. 66, § 10 (b)]."  See Amendment to House Doc. No. 5272 dated July 24, 2002.  While any decision by a records custodian to withhold records already was subject to review by the supervisor of public records, see G. L. c. 66, § 10 (b), the Legislature's emphasis on the availability of such review indicates its understanding that exemption (n) was not an unbounded, unreviewable expansion of the discretion of records custodians.

The first prong of exemption (n) probes whether, and to what degree, the record sought resembles the records listed as examples in the statute.  The touchstone of this inquiry is whether, and to what degree, the record is one a terrorist "would find useful to maximize damage," EOPS Memorandum, and in that sense jeopardize public safety.[11]

The second prong of exemption (n) probes the factual and contextual support for the proposition that disclosure of the record is "likely to jeopardize public safety."  G. L. c. 4, § 7, Twenty-sixth (n).  Because the records custodian must exercise "reasonable judgment" in making that determination, the primary focus on review is whether the custodian has provided sufficient factual heft for the supervisor of public records or the reviewing court to conclude that a reasonable person would agree with the custodian's determination given the context of the particular case.[12]

---

[11] The statutory language makes clear that this jeopardy to public safety contemplates damage to "persons or buildings . . . or other infrastructure."  G. L. c. 4, § 7, Twenty-sixth (n).

[12] On this point, we observe that the Secretary of the Commonwealth, through regulations and a guide, appears to view exemption (n) as uniquely permitting a records custodian to inquire into the requestor's purpose for seeking a particular record before determining whether to release it.  See 950 Code Mass. Regs. § 32.06(2)(h)(1) (2017); Secretary of the Commonwealth, Division of Public Records, A Guide to the Massachusetts Public Records Law 27 (updated Jan. 2017).  We do not decide whether this inquiry is appropriate, as that issue is

These two prongs of exemption (n) must be analyzed together, because there is an inverse correlation between them. That is, the more the record sought resembles the records enumerated in exemption (n), the lower the custodian's burden in demonstrating "reasonable judgment" -- and vice versa.

In some cases, the first prong of exemption (n) will yield a strong resemblance between the record sought and the types of records listed in the statute -- for instance, when a requestor seeks access to exactly one of the types of records listed in exemption (n), such as a blueprint or emergency preparedness plan. In those cases, with respect to the second prong of exemption (n), the custodian still bears the burden of demonstrating that it exercised "reasonable judgment" in determining that disclosure of the record is "likely to jeopardize public safety," G. L. c. 4, § 7, Twenty-sixth (n). But this burden will be at its lowest.

Conversely, as the resemblance between the record sought and the listed examples in exemption (n) decreases, the custodian's burden for demonstrating "reasonable judgment" increases. Thus, when the requested record bears little or no

---

not directly before us. We note, however, that nothing we discovered in our review of the legislative history indicated an intent to depart radically from the typical public records procedure, which would not permit such an inquiry. See 950 Code Mass. Regs. § 32.06(2)(h). See also note 10, supra.

resemblance to the listed examples, the custodian's burden for demonstrating that it exercised "reasonable judgment" in determining that disclosure of the record is "likely to jeopardize public safety" will be at its highest.

We recognize that the Superior Court judge did not have the benefit of our construction of exemption (n) when he granted judgment to the department. Therefore, we vacate the decision and remand the matter for consideration of PETA's request in light of this opinion. See Blixt v. Blixt, 437 Mass. 649, 660, 666 (2002), cert. denied, 537 U.S. 1189 (2003) (reversing and remanding for further consideration in light of court's interpretation of governing statute).

In this regard, it is well to note that exemption (n) is unique among the public records exemptions in its inclusion of the phrase "reasonable judgment of the record custodian." See generally G. L. c 4, § 7, Twenty-sixth. Such language neither requires or even invites any heightened level of deference to the records custodian's initial determination whether to disclose or withhold a record. Rather, we agree with the department's concession at oral argument: that a court should review the custodian's determination de novo. Cf. Wakefield Teachers Ass'n v. School Comm. of Wakefield, 431 Mass. 792, 796 (2000) (application of statutory exemption from definition of "public records" is question of statutory interpretation);

Champa v. Weston Pub. Sch., 473 Mass. 86, 89-90, 96 (2015) (following supervisor of public records' decision, court reviewed de novo order allowing judgment on pleadings).

2. Exemption (c). The judge also approved the department's redaction of the names, addresses, and telephone numbers identifying individual persons as consignees, consignors, or veterinarians. The judge concluded that exemption (c) protects such information from disclosure because the identified individuals "have a considerable privacy interest in their identities, addresses, and telephone numbers" that is not substantially outweighed by the public interest in releasing that information.

Unlike exemption (n), exemption (c) previously has been the subject of our consideration in a number of different contexts. Exemption (c) permits the withholding of "personnel and medical files or information," as well as "any other materials or data relating to a specifically named individual, the disclosure of which may constitute an unwarranted invasion of personal privacy." G. L. c. 4, § 7, Twenty-sixth (c).

Exemption (c) requires a balancing test: where the public interest in obtaining the requested information substantially outweighs the seriousness of any invasion of privacy, the private interest in preventing disclosure must yield. See Champa, 473 Mass. at 96. On one side of the scale, we have

looked to three factors to assess the weight of the privacy interest at stake: (1) whether disclosure would result in personal embarrassment to an individual of normal sensibilities; (2) whether the materials sought contain intimate details of a highly personal nature;[13] and (3) whether the same information is available from other sources. Globe Newspaper Co. v. Police Comm'r of Boston, 419 Mass. 852, 858 (1995). We have also said that "other case-specific relevant factors" may influence the calculus. Id. On the other side of the scale, we have said that the public has a recognized interest in knowing whether public servants are carrying out their duties in a law-abiding and efficient manner.[14] Id.

---

[13] Looking to the Federal counterpart to exemption (c) as a guide, we have said that such "intimate details" may include "marital status, legitimacy of children, identity of fathers of children, medical condition, welfare payments, alcohol consumption, family fights, [and] reputation" (citations omitted). Attorney Gen. v. Assistant Comm'r of the Real Prop. Dep't of Boston, 380 Mass. 623, 626 n.2 (1980), and cases cited. We also have said that the "[n]ames and addresses of adults are not 'intimate details' of a 'highly personal nature'" (citation omitted). Cape Cod Times v. Sheriff of Barnstable County, 443 Mass. 587, 595 (2005).

[14] PETA has not attempted to articulate a public interest in obtaining the information sought. Instead, it has argued that because there is no privacy interest whatsoever in business contact information, the burden has not yet shifted to PETA to articulate a public interest that might overcome the privacy interest. Accordingly, if the judge on remand finds some privacy interest does exist in the redacted information, PETA must be afforded an opportunity to articulate a public interest on the other side of the balancing test.

PETA argues that the judge erred by presuming that publicly available business contact information implicated a privacy interest, and thereby inappropriately shifted the burden to PETA to show that the public interest in disclosure substantially outweighed a nonexistent privacy interest. The department did not advance a privacy rationale until well after it made the redactions in question. Nevertheless, it now urges us to adopt the judge's reasoning that the information in question does implicate a measurable privacy interest (stemming from the purported safety risks associated with releasing such information), and that this privacy interest is not substantially outweighed by any public interest in the release of the information.

Exemption (c) requires a nuanced analysis. At the outset, the application of exemption (c) in this case must account for the difference between the privacy interest in one's home address and the privacy interest in one's business address.[15]

---

[15] PETA appears to assume that the redacted information related to individuals (as opposed to facilities) pertains only to their place of business; the department does not directly refute this point. Because of the department's redactions, the record itself sheds no light on the subject. On remand, in order to allow the judge to calibrate the privacy balancing test properly, the parties may stipulate as to the precise nature of this information, or the judge may employ some other mechanism, such as in camera review, for discerning the nature of the information sought. See Worcester Tel. & Gazette Corp. v. Chief

Compare <u>Federal Labor Relations Auth</u>. v. <u>United States Dep't of Navy, Naval Communications Unit Cutler, E. Machias, Me</u>., 941 F.2d 49, 55-56 (1st Cir. 1991) (privacy interest in one's name and home address is "discernible" and "real enough to be worthy of recognition and protection in appropriate circumstances"), with <u>Cape Cod Times</u> v. <u>Sheriff of Barnstable County</u>, 443 Mass. 587, 595 (2005) ("Names and addresses of adults are not 'intimate details' of a 'highly personal nature,'" therefore exemption [<u>c</u>] "does not bar inspection of records containing the names and addresses of individuals who serve as reserve deputy sheriffs" [citation omitted]); <u>Pottle</u> v. <u>School Comm. of Braintree</u>, 395 Mass. 861, 864 (1985) (public school employees' names and home addresses do not fall within exemption [<u>c</u>]); and <u>Hastings & Sons Publ. Co</u>. v. <u>City Treasurer of Lynn</u>, 374 Mass. 812, 818 (1978) (municipal payroll records, which included names and addresses of employees, "not the kind of private facts that the Legislature intended to exempt from mandatory disclosure" with exemption [<u>c</u>]).

We acknowledge that cases like <u>Cape Cod Times</u> and <u>Pottle</u> dealt with the home addresses of public employees, whereas this case appears to implicate the business addresses of nonpublic employees. See <u>Georgiou</u> v. <u>Commissioner of the Dep't of Indus.</u>

<u>of Police of Worcester</u>, 436 Mass. 378, 384-385 (2002) (discussing various mechanisms for judicial inspection).

Accs., 67 Mass. App. Ct. 428, 435-436 (2006) (recognizing public employees' diminished expectation of privacy in certain information). But exemptions to the public records laws must be applied on a case-by-case basis, Worcester Tel. & Gazette Corp., 436 Mass. at 383-384, and "the same information about a person, such as his name and address, might be protected from disclosure as an unwarranted invasion of privacy in one context and not in another." Torres v. Attorney Gen., 391 Mass. 1, 9 (1984). Accordingly, the exemption (c) balancing test in this case should account for the different privacy interests in a home address versus a business address, and held by a public employee versus a private one.

Relatedly, the exemption (c) balancing test must account for the fact that the gravity of any putative invasion of privacy resulting from disclosure of the records sought may be reduced if "substantially the same information is available from other sources." Attorney Gen. v. Collector of Lynn, 377 Mass. 151, 157 (1979). Indeed, one reason that a person's business address normally will give rise to a lower privacy interest than her home address is that business addresses typically are widely shared with others and, in this case at least, may well be exposed to scrutiny by researchers, government agencies,

shippers, and possibly others.[16]  See <u>Brown</u> v. <u>Perez</u>, 835 F.3d 1223, 1235 (10th Cir. 2016) ("It is not intuitive to us that the referee physicians possess a cognizable privacy interest in their business addresses -- after all, it is in their economic interests to make their office locations generally available to the public, so that patients can visit for evaluation and treatment").

Finally, the department raises the suggestion that risks to the personal safety of individuals from the release of certain requested information should be factored into the exemption (<u>c</u>) balancing calculus.  Given the record and the briefs before us, it is a suggestion to be approached quite gingerly.

On the one hand, we have not located any cases of this court interpreting or applying exemption (<u>c</u>) in the way the department proposes.  Indeed, our cases have cabined the scope of exemption (<u>c</u>) in a way that would seem to minimize the relevance of potential security concerns to the privacy

---

[16] The department's observation that "PETA does not suggest that the identities of the <u>same</u> persons identified in the certificates at issue here have already been disclosed" rings somewhat hollow; PETA could not know the identities on the certificates because the department redacted them.  If the department decides to pursue that point on remand, it carries the burden of showing that the exemption applies.  See G. L. c. 66, § 10 (<u>c</u>).  Consequently, as mentioned in note 15, <u>supra</u>, some type of stipulation or in camera inspection might be necessary to determine whether some or all of the information is already available in the public domain before a ruling on the privacy exemption is possible.

calculus.[17]  See, e.g., Hastings & Sons Publ. Co., 374 Mass. at 817-818 (municipal police officers' names and addresses not protected by exemption [c]); Cape Cod Times, 443 Mass. at 594 (same regarding names and addresses of reserve deputy sheriffs). On the other hand, we have said that "the same information about a person, such as his name and address, might be protected from disclosure as an unwarranted invasion of privacy in one context and not in another." Torres, 391 Mass. at 9.  Accordingly, we are unwilling to eliminate wholly the possibility that, in very limited circumstances where the department can identify specific information demonstrating that a significant risk to an individual's personal safety is posed by the disclosure of a home address or telephone number, that non-dispositive factor can add weight to whatever privacy interest exists on that side of the balancing test.

In sum, the exemption (c) analysis should be tailored to the several "case-specific relevant factors," Globe Newspaper

---

[17] It appears that precisely such concerns motivated the adoption, in 1996, of G. L. c. 66, § 10 (d), third par., as amended through St. 2010, c. 256, §§ 58-59, which, at the time relevant to this case, exempted from the definition of "public records" the "home address and home telephone number of law enforcement, judicial, prosecutorial, . . . and any other public safety and criminal justice system personnel."  See, e.g., Memorandum, Office of the Governor's Legal Counsel, Mar. 12, 1996 (subsection (d), third par., aimed "to protect persons whose employment might subject them or their family members to harassment or retaliation").

Co., 419 Mass. at 858, that PETA's request presents.  Among them are (1) whether the redacted information pertains to home or business addresses of public or private entities; (2) whether, and to what extent, that information is available from other sources; and (3) whether, and to what extent, the department can identify specific information demonstrating that a significant risk to an individual's personal safety is posed by the disclosure of a home address or telephone number that may be among the redacted information.

Conclusion.  The entry of judgment for the defendant is vacated and set aside.  The matter is remanded to the Superior Court for further proceedings consistent with this opinion.

So ordered.