NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

SJC-12769

 KEVIN RICHARDSON, SECOND[1]  vs.  THE UPS STORE, INC., & another.[2]


        Suffolk.     April 9, 2020. - October 28, 2020.

     Present:  Gants, C.J., Lenk, Gaziano, Lowy, Budd, Cypher,
                     & Kafker, JJ.[3]


             Notary Public.  Statute, Construction.



        Certification of a question of law to the Supreme Judicial
Court by the United States District Court for the District of
Massachusetts.


        Orestes G. Brown for the plaintiff.
        Joseph R. Palmore, of the District of Columbia, for the
defendants.
        Michael Walsh, for Walsh & Walsh LLP, amicus curiae,
submitted a brief.

_____

        [1] Individually and on behalf of all others similarly
situated.

        [2] J&V Logistics LLC.

        [3] Chief Justice Gants participated in the deliberation on
this case prior to his death.

BUDD, J. In this case we have been asked by the United States District Court for the District of Massachusetts whether G. L. c. 262, §§ 41 and 43, Executive Order Nos. 455 (03-13) and 455 (04-04), or the codification of such orders within G. L. c. 222, limit the fees that a notary public may charge for any and all notarial acts to no more than $1.25. The question arises in connection with a lawsuit brought by the plaintiff, Kevin Richardson, II, alleging that the defendants, The UPS Store, Inc., and J&V Logistics LLC, the franchise owner, overcharged him for notary services. We conclude that the $1.25 fee cap set forth in G. L. c. 262, § 41, applies only to a particular notarial act known as "noting," i.e., a step in the process of protesting a dishonored negotiable instrument, and that the meaning of that section has not been expanded, either by statute or executive order, to include all notarial acts.[4] And aside from § 41 there currently are no statutes or executive orders that cap fees for any other notarial act.

Background. We recite the undisputed facts relevant to the certified question. The plaintiff used the services of a notary public at the subject UPS store to notarize documents signed by the plaintiff or his wife various times between 2012 and 2016. On at least three occasions, the plaintiff was charged a total

---

[4] We acknowledge the amicus brief submitted by Walsh & Walsh LLP.

of ten dollars per service, including $1.25 for the notarization and $8.75 for clerical fees.

In August 2016, the plaintiff filed suit against the defendants in the Superior Court, alleging violations of G. L. c. 262, § 41, and G. L. c. 93A. The defendants removed the case to the United States District Court for the District of Massachusetts under the Federal Class Action Fairness Act of 2005, where the plaintiff moved for class certification of present and former purchasers of notarization services from the defendants for the period between August 30, 2012, to the date of judgment, and alleging $5.9 million in damages. The defendants opposed class certification and moved to certify to this court the question whether § 41 applies to all notarial acts as the plaintiff contends. The District Court certified the question regarding the scope of § 41, and denied the plaintiff's motion for class certification with leave to renew within fourteen days of our opinion on this matter.

The certified question[5] put to this court asks:

> "Does [G. L. c. 262, § 41 or 43,] proscribe fees in excess of $1.25 for notarization of a document where the notarial act at issue is unrelated to the protest of a bill of exchange, order, draft or check for non-acceptance or non-payment, or of a promissory note for non-payment and what, if any, impact do Executive Order Nos. 455 (03-13) and 455 (04-04) and the codification of Executive Order No. 455

---

[5] The original certified question, which made reference only to G. L. c. 262, §§ 41 and 43, was expanded to include Executive Order No. 455 and G. L. c. 222 in the inquiry.

(04-04) as [G. L. c. 222] in 2016 have on the question of whether [G. L. c. 262, § 41 or 43,] proscribe such fees?"

For reasons explained infra, we answer the question "no," G. L. c. 262, §§ 41 and 43, do not proscribe fees for acts unrelated to the protest of a negotiable instrument, and neither Executive Order Nos. 455 (03-13) and 455 (04-04) nor G. L. c. 222 has any impact on our interpretation of §§ 41 and 43.

Discussion. 1. Scope of G. L. c. 262, § 41. In determining the scope of § 41, "[o]ur analysis begins with the statutory language, the principal source of insight into [l]egislative purpose" (quotation and citation omitted). Dental Serv. of Mass., Inc. v. Commissioner of Revenue, 479 Mass. 304, 306 (2018). Section 41 provides:

> "The fees of notaries public shall be as follows: For the protest of a bill of exchange, order, draft or check for non-acceptance or non-payment, or of a promissory note for non-payment, if the amount thereof is [$500] or more, one dollar; if it is less than [$500], fifty cents; for recording the same, fifty cents; for noting the non-acceptance or non-payment of a bill of exchange, order, draft or check or the non-payment of a promissory note, seventy-five cents; and for each notice of the non-acceptance or non-payment of a bill, order, draft, check or note, given to a party liable for the payment thereof, twenty-five cents; but the whole cost of protest, including necessary notices and the record, if the bill, order, draft, check or note is of the amount of [$500] or more, shall not exceed two dollars, and if it is less than [$500], shall not exceed one dollar and fifty cents; and the whole cost of noting, including recording and notices, shall in no case exceed one dollar and twenty-five cents" (emphasis added).

The plaintiff contends that § 41 limits the fees that notaries public are permitted to charge for any notarial act to $1.25. In support of this interpretation, he points to the last sentence in § 41, which states: "[T]he whole cost of noting . . . shall in no case exceed one dollar and twenty-five cents." We are not convinced.

By its plain language, § 41 applies to fees charged by notaries public in connection with the act of "protesting" the nonpayment of a negotiable instrument. A protest is a series of notarial acts in which a notary public prepares a certificate of dishonor verifying that a negotiable instrument, such as a check or promissory note, was dishonored by nonacceptance or nonpayment. See G. L. c. 106, § 3-505 (b). The certificate is used to recover the money owed. See G. L. c. 106, §§ 3-503 (a), 3-505 (b). Although this process rarely is used in modern times, it was a common procedure in 1836, when the law was first passed. R.S. (1836), c. 122, § 16.[6] Section 41 enumerates a

---

[6] General Laws c. 262, § 41, is the current codification of a statute that was originally enacted in 1836 as R.S. (1836), c. 122, § 16. Since its enactment in 1836, the statute has undergone multiple revisions as the Legislature periodically recompiled its statutes. See R.S. (1836), c. 122, § 16; G.S. (1860), c. 157, § 13; P.S. (1882), c. 199, § 21; R.L. (1902), c. 204, § 31; G. L. c. 262, c. 41 (1921). The final clause, providing that "the whole cost of noting, including recording and all notices, shall in no case exceed one dollar and twenty-five cents," was introduced in 1839, and has remained unchanged since. See St. 1839, c. 93, § 1.

variety of fees associated with discrete notarial acts within the process of protesting, including two separate fee caps that limit the "whole cost of protest" to two dollars if the negotiable instrument is worth $500 or more, and $1.50 if the negotiable instrument is worth less than $500.

The statute does not define "noting"; thus, it is to be "construed according to the common and approved usage of the language."  G. L. c. 4, § 6, Third.  At the same time, however, "technical words and phrases and such others as may have acquired a peculiar and appropriate meaning in law shall be construed and understood according to such meaning."  Id.  See Anderson v. National Union Fire Ins. Co. of Pittsburgh PA, 476 Mass. 377, 382 (2017).

The plaintiff argues that "noting" should be broadly defined according to various dictionary definitions of the verb "to note" and that the phrase "the whole cost of noting" refers to all notarial acts, thereby limiting the fee for all notarial acts to $1.25.  However, there is ample evidence, including the unique context and use of the term in § 41, that it is used as a term of art, limited in meaning and application.

When § 41 was enacted in the mid-1800s, "noting" commonly was known as a step in the process of protesting the failure to honor a negotiable instrument.  See F.M. Hinch, John's American Notary and Commissioner of Deeds Manual § 442, at 281 (3d ed.

1922).  It refers to a notary's act of initialing, dating, and briefly describing the stated reason for the failure to honor a negotiable instrument as a precursor to issuing a formal certificate of protest.  See A.E. Piombino, Notary Public Handbook:  Principles, Practices & Cases, National Edition 177 (1996) (defining "note of protest" as "brief written statement of the fact of a protest, signed by the notary public on the bill, which will be transcribed into proper form at a later time"); J.O. Skinner, A Book of the Laws of Washington Relating to Notaries Public 234 (1911) ("The 'noting' of a bill is merely a preliminary step to the protest . . .").  Black's Law Dictionary likewise refers to "noting" in its definition of "protest," describing it as "[a] notary public's written statement that, upon presentment, a negotiable instrument was neither paid nor accepted" and stating that this process is also termed "initial protest" and "noting protest."  Black's Law Dictionary 1479 (11th ed. 2019).

By noting the protest, notaries could date certificates when they were received, making it easier to comply with time restrictions associated with protesting.  See Bailey v. Dozier, 47 U.S. 23, 29 (1848) ("if the bill has been duly presented for acceptance, or payment, and dishonored, and a minute made, at the time, of the steps taken, which is called noting the bill, the protest may be drawn up in form afterwards, at the

convenience of the notary"); Allen v. Merchant's Bank of N.Y., 22 Wend. 215, 242 (N.Y. 1839) (when protesting foreign bill, sufficient to "note the protest on the day of demand, and it may be drawn up in form at a future period" [citation omitted]).

Various courts, including this one, referred to "noting" in this context in the 1800s. See Opinion of the Justices, 150 Mass. 586, 588 (1890) (recognizing "noting and extending of marine protests" as one of principal acts of notaries public within Commonwealth). See also Bailey, 47 U.S. at 29; Smith v. Roach's Ex'r, 46 Ky. 17, 19 (1846); Allen, 22 Wend. at 242; Bank of the Ohio Valley v. Lockwood, 13 W. Va. 392, 432-433 (1878). Thus, we conclude that "noting" as it appears in § 41 is used as a term of art rather than as the broader definition of the verb "to note," as in "to make a brief written statement."[7] See Black's Law Dictionary 828 (1st ed. 1891).

---

[7] Even if we were to adopt the nontechnical definition of "noting" as "mak[ing] a brief written statement," as discussed infra, the subject matter of the statute dictates that we limit the scope of this general term to protests only. Section 41 sets fees for "the protest of a bill of exchange, order, draft or check for non-acceptance or non-payment, or of a promissory note for non-payment," "recording the same," "noting the non-acceptance or non-payment of a bill of exchange, order, draft or check or the non-payment of a promissory note," "each [such] notice . . . given to a party liable for the payment thereof," and "the whole cost of protest," before using the general phrase "the whole cost of noting." G. L. c. 262, § 41. Because all of the other acts enumerated in § 41 are unambiguously related to the process of protest, "noting" must likewise refer, at its broadest, to brief written statements made in the course of a protest.

Other rules of statutory construction also point to this result.  The canon of noscitur a sociis counsels that terms must be read within the context of the statute in which they appear. "[A] general term in a statute or ordinance takes meaning from the setting in which it is employed.  The literal meaning of a general term in an enactment must be limited so as not to include matters that, although within the letter of the enactment, do not fairly come within its spirit and intent." People for the Ethical Treatment of Animals, Inc. v. Department of Agric. Resources, 477 Mass. 280, 287-288 (2017), quoting Kenney v. Building Comm'r of Melrose, 315 Mass. 291, 295 (1943). Section 41 sets a schedule of fees for particular notarial acts, all of which unambiguously refer to acts related to the process of protest.  The final clause, setting a fee for "the whole cost of noting," takes its meaning from the rest of § 41, and therefore must also refer to a particular protest-related act, that is, the technical definition of noting an initial protest, discussed supra.  Additionally, "[w]here the Legislature uses the same words in several sections which concern the same subject matter, the words must be presumed to have been used with the same meaning in each section" (quotation and citation omitted).  Insurance Rating Bd. v. Commissioner of Ins., 356 Mass. 184, 188-189 (1969).  Section 41 uses "noting" twice in setting fee limitations.  Its first use sets a fee limit of

seventy-five cents for "noting the non-acceptance or nonpayment of a bill of exchange," firmly contextualizing "noting" as a notarial act within the scope of protest.  Section 41 then uses "noting" within the clause at issue, limiting the "whole cost of noting" to $1.25.  Due to the Legislature's repeated use of "noting" within § 41, we must presume that the Legislature intended to use the term consistently throughout the statute, and therefore interpret the second use of noting to be limited by the first.

We also must treat the Legislature's decision not to use a broad catch-all phrase such as "notarial act" at the end of § 41 as intentional, and therefore cannot imply its meaning where the phrase was excluded.  See Commonwealth v. Gagnon, 439 Mass. 826, 833 (2003), quoting 2A N.J. Singer, Sutherland Statutory Construction § 46.06, at 194 (6th ed. rev. 2000) ("[W]here the legislature has carefully employed a term in one place and excluded it in another, it should not be implied where excluded").  The Legislature defines "notarial act," or "notarization," as "an act that a notary public is empowered to perform" in G. L. c. 222, § 1.  Among other things, G. L. c. 222, discussed infra, sets forth rules and regulations for notaries public.  See G. L. c. 222, §§ 15, 16, 22, 23.  In contrast, § 41 excludes any mention of "notarial acts" generally, and instead uses precise language throughout the

section to regulate the steps of a protest. We must presume that had the Legislature intended the final clause in § 41 to limit fees for all notarial acts, it would have done so.

Finally, if we were to interpret the last mention of "noting" in § 41 as meaning all notarial acts so as to limit the fee for all notarial acts to $1.25, that would render other parts of § 41 both ambiguous and meaningless, a result we eschew. See King v. Town Clerk of Townsend, 480 Mass. 7, 11 (2018) (declining to "adopt an interpretation that renders the act ambiguous"); Phillips v. Equity Residential Mgt., L.L.C., 478 Mass. 251, 258 (2017), quoting Adamowicz v. Ipswich, 395 Mass. 757, 760 (1985) ("so long as it yields a 'logical and sensible result,' we do not interpret a statute so as to render any portion of it meaningless"); ROPT Ltd. Partnership v. Katin, 431 Mass. 601, 603 (2000) (court may not interpret statutes to produce illogical result).

Interpreting "the whole cost of noting" to mean the cost of any notarial act would result in the final clause of § 41 capping fees at $1.25 for all notarial acts, including the various acts of protest regulated in earlier clauses of § 41. This interpretation of the "whole cost of noting" creates direct conflict with the earlier clause that caps fees for the "whole cost of protest" at two dollars for negotiable instruments with a value of $500 or more and at $1.50 for negotiable instruments

with a value under $500.  Protest, as a notarial act, would be regulated both by the "whole cost of protest" clause with fee limits of two dollars or $1.50, and by the "whole cost of noting" clause, which sets a cumulative cap of $1.25 under this interpretation.  Defining "the whole cost of noting" as the cost of any notarial act renders the fee limits on the "whole cost of protest" meaningless because of the conflicting fee caps and creates ambiguity over which fee limitation applies when protesting negotiable instruments.  We reject this interpretation, as it produces an illogical and contradictory result.  See Commonwealth v. Rosado, 450 Mass. 657, 663 (2008), quoting ROPT Ltd. Partnership, 431 Mass. at 603 (rejecting interpretation that would "produce an illogical result").

For all of the reasons outlined supra, we conclude that the Legislature used "noting" as a term of art describing a specific step in the process of noting and did not intend for it to refer to all notarial acts.[8]

---

[8] The plaintiff points to legislative history to support his interpretation of § 41.  He contends that, in adding the "whole cost of noting" clause to § 41 in 1839, three years after the statute was enacted, the Legislature intended to insert a catch-all fee for all notarial acts, as was present in two colonial laws regulating notary fees that predated § 41.  See R.S. (1836), c. 122, § 16; St. 1839, c. 93, § 1.  The first colonial regulation of notary public fees was enacted in 1650 and included a catch-all fee for "any kind of [writing] not hereby specially [provided] for."  See 3 Records of the Governor and Company of the Massachusetts Bay in New England 210 (1854).  By

2.  Section 43.  The plaintiff argues that § 43, which governs the fees for official duties or services, confirms that the fee for any notarial act is capped at $1.25.  This argument is misplaced.  General Laws c. 262, § 43, provides:  "The fees of public officers for any official duty or service shall, except as otherwise provided, be at the rate prescribed in this chapter for like services."  The plaintiff apparently contends that § 43 applies the $1.25 fee limit set forth in § 41 to "like services," and that "like services" means all notarial acts.  This argument presupposes that § 41 sets a $1.25 fee cap, which, as discussed supra, is an interpretation we reject.

The ordinary meaning of "like" is "[e]qual in quantity, quality, or degree; corresponding exactly," or "[s]imilar or substantially similar; of much the same nature."  Black's Law Dictionary 1113 (11th ed. 2019).  "Like services," then, refers to acts that are virtually identical to ones with fees prescribed in G. L. c. 262.  Our interpretation of the precursor

---

1713, a different fee schedule for notaries public had been established, including a similar catch-all provision for "other writings" on a per page basis.  See P.L. (1713-1714), c. 4. However, the Legislature did not codify either of the colonial fee schedules when it enacted the statute at issue in 1836. Further, when the Legislature added the "whole cost of noting" clause in 1839, it did not adopt the catch-all language of the colonial acts, which referred to "any kind of [writing]" and "other writings"; instead, the Legislature used "noting," which, as discussed supra, is a term with a well-established technical meaning.

statute[9] to § 43 is consistent with this view.  In Howard v.
Proctor, 7 Gray 128 (1856), a tax collector charged the
plaintiffs a commission for costs related to the collector's
seizure and sale of the plaintiffs' horse to recover unpaid
taxes.  Id. at 130, 132-133.  Although no statute specifically
prescribed the fees chargeable by a tax collector, we reasoned
that, under the precursor statute to § 43, the tax collector was
permitted to charge a fee equal to the statutory fee prescribed
for the same act carried out by a sheriff.  Id. at 132-133 ("The
like services are those of the sheriff").  In Converse v.
Jennings, 13 Gray 77 (1859), we concluded that a tax collector
could not charge the statutory fee chargeable by a sheriff for
executing a levy on real estate because the tax collector's
action of stopping the sale of a property for nonpayment of
taxes was not a "like service" to the sheriff's levy on a
completed sale.  Id. at 78.  Howard and Converse effectuated our
understanding that fees for "like services" means statutorily
prescribed fees for the same services performed by a different

---

[9] The relevant statutory language was first enacted in 1836:
"In all cases, not expressly provided for by law, the fees of
all public officers, for any official duty or service, shall be
at the same rate as those prescribed in this chapter for the
like services."  R.S. (1836), c. 122, § 21.  Over the subsequent
decades, this statute was slightly revised as the Legislature
recompiled its statutes.  See G.S. (1860), c. 157, § 14; P.S.
(1882), c. 199, § 23; R.L. (1902), c. 204, § 33; St. 1913,
c. 611, § 16.  It was renumbered as G. L. 262, § 43, in 1921,
where it has remained with the relevant language unchanged.

type of official.  See <u>Simmons</u> v. <u>County of Suffolk</u>, 230 Mass. 236, 238 (1918) (applying same statutory standard of compensation to different justices and clerks for performing same "like" services).

Thus, read together with § 41, § 43 simply requires other officials who are authorized to provide the services described in § 41 to limit the fees for such services to those enumerated in § 41.  For example, a "United States consul or vice consul" is also permitted to prepare a protest pursuant to G. L. c. 106, § 3-505 (<u>b</u>).  Section 43 requires a consul who provides that service to limit the fees charged to those set forth in § 41.  Section 43 does not, by reference to "the rate prescribed in this chapter for like services," extend the $1.25 fee limit for the "whole cost of noting" in § 41 to all notarial acts.  As discussed <u>supra</u>, "noting" a protest is a discrete notarial act.  It is not a service "like" other notarial acts, such as notarizing a document or witnessing a signature.  For these reasons, we conclude that § 43 has no impact on the scope or meaning of § 41.

3.  <u>Impact of subsequent executive orders and legislation on scope of § 41</u>.  The plaintiff additionally argues that, even if "noting" was used as a term of art when § 41 was passed in 1836, by referencing § 41 in Executive Order No. 455, in effect the Governor altered the section so that the meaning of the

phrase "the whole cost of noting, including recording and notices, shall in no case exceed [$1.25]" was no longer limited to protests but was extended to any notarial act.[10]  We do not agree.

In 2003, the Governor issued Executive Order No. 455, entitled "Standards of Conduct for Notaries Public," to provide contemporary guidelines regarding the proper duties and conduct of notaries public.[11]  See Executive Order No. 455 (03-13).  The executive order provided notaries public with notice of what behavior constituted misconduct and would be considered by the Governor when deciding whether to appoint, reappoint, or remove a notary's commission.  See Executive Order No. 455 (04-04),

---

[10] We note that in 2016, in addition to codifying substantial portions of Executive Order No. 455, the Legislature added §§ 16 and 19 to G. L. c. 222, which provide that notaries public cannot charge fees in excess of "the fee provided for in [G. L. c. 262, § 41,] or any other general or special law or executive order," and must tender services when such fee is paid (emphasis added).  See G. L. c. 222, §§ 16 (a) (vi), 19, inserted by St. 2016, c. 289, § 6.  Thus, the Legislature has authorized the Governor to promulgate fee limitations for notarial acts, in addition to the Governor's constitutional authority over the appointment and removal of notaries public. See arts. 4 and 37 of the Amendments to the Massachusetts Constitution.

[11] In 2004, the Governor issued a revised Executive Order No. 455, which made multiple revisions to the original order. Compare, e.g., Executive Order No. 455 (04-04), § 1, with Executive Order No. 455 (03-13), § 1.  However, the relevant provisions of Executive Order No. 455 are identical in both orders.  See Executive Order No. 455 (04-04), §§ 2, 6(a)(6), 7; Executive Order No. 455 (03-13), §§ 2, 6(a)(6), 7.

§ 1(a).  With regard to § 41, it provided:  "A notary public shall not perform a notarial act if . . . the notary public will receive as a direct result of the notarial act any commission, fee, . . . or other consideration exceeding in value the fees set forth in [G. L. c. 262, § 41] . . . ."  Id. at § 6(a)(6).  It similarly required that "[a] notary shall perform any notarial act described in this executive order for any person requesting such an act who tenders the fee set forth in [G. L. c. 262, § 41]," unless certain circumstances not relevant here are present.  Id. at § 7.

According to a document published in 2003 by the Governor's legal counsel, entitled "Frequently Asked Questions and Clarifications:  Executive Order 455 (03-13)," the primary purpose of Executive Order No. 455 was to prevent fraud, forgery, and other misconduct by notaries public.

Importantly, although Executive Order No. 455 referenced § 41, the clear intent was to provide a mechanism to enforce that section, not to interpret or modify it.[12]  See Frequently

---

[12] Earlier, in 1996, the Secretary of the Commonwealth published a brochure entitled "Guidelines for the Notary Public."  Under the heading "What fees may a notary legally charge?" the document provides:

"According to their fee statute [G. L. c. 262, § 41 (1986 ed.)], notaries public may charge no more than one dollar and twenty-five cents ($1.25) for noting and recording a document and no more than two dollars ($2.00) for

Asked Questions and Clarifications:  Executive Order 455 (03-13), <u>supra</u> ("Does the Executive Order change any statutes?  No.  If there is a statutory requirement in place, the Executive Order does not change that requirement").

In 2016, the Legislature enacted a sweeping reform in notary public law with the passage of St. 2016, c. 289, entitled "An Act regulating notaries public to protect consumers and the validity and effectiveness of recorded instruments".  The statute significantly amended G. L. c. 222 and imposed the first significant regulations on the conduct of notaries public in decades.  See, e.g., G. L. c. 222, §§ 13 (qualifications for appointment), 15 (listing notarial acts and prescribing forms for acknowledging signatures), 16 (prohibiting certain acts), 17 (prohibiting notaries from practicing law unless licensed attorneys), 21 (requiring specific language in notary public

---

protesting commercial paper.  As a notary, you are a public servant and should be available to perform a public service at a reasonable cost.  Excessive charges could result in complaints to the Governor's Council."

The plaintiff contends that this publication indicates that the Secretary understood G. L. c. 262, § 41, as setting a $1.25 fee for "noting and recording" <u>any</u> document.  However, this publication, like Executive Order No. 455, simply refers to § 41; it does not purport to modify its meaning.  Even more telling, the brochure admonishes notaries that they should be "available to perform a public service at a reasonable cost" and that "[e]xcessive charges could result in complaints to the Governor's Council."  There would be no need for such warnings if § 41 set the fee for any notarial act at no more than $1.25.

advertisements in languages other than English).  In doing so, the Legislature codified and replaced Executive Order No. 455's provisions referencing G. L. c. 262, § 41, by including G. L. c. 222, §§ 16 and 19, which largely mirror the language of the order.  See Executive Order No. 571 (Oct. 6, 2016) (repealing Executive Order No. 455, effective on same date on which St. 2016, c. 289, went into effect).

Using virtually the same language as Executive Order No. 455, G. L. c. 222, § 16 (a) (vi), prohibits a notary public from performing "a notarial act" for any fee "exceeding the maximum fees provided in [G. L. c. 262, § 41,] or any other general or special law or executive order."  Section 19 provides that a notary public must perform "a notarial act" for any person tendering "the fee provided for in [G. L. c. 262, § 41,] or any other general or special law or executive order," subject to certain exceptions not relevant here.  In turn, G. L. c. 222, § 1, defines "notarial act" and "notarization" as "an act that a notary public is empowered to perform."

The plaintiff argues that the references to § 41 in §§ 16 and 19 extend the $1.25 fee cap in § 41 to all notarial acts, because G. L. c. 222 expressly defines "notarial act" to encompass any act performed by a notary public and §§ 16 and 19 do not state that the fees set forth in § 41 are prescribed only for acts related to protest.  However, merely referencing a

previous statute by title and chapter does not suffice to amend or alter the meaning of the referenced statute.

By their plain language, §§ 16 and 19 require a notary public to provide services after receipt of the appropriate fees, see G. L. c. 222, § 19, and prohibit a notary public from receiving payment in excess of the maximum fees, G. L. c. 222, § 16 (a) (vi). Accordingly, these sections refer not only to § 41, but also to the fees prescribed for a "notarial act" by "any other general or special law or executive order." G. L. c. 222, §§ 16 (a) (vi), 19. At the time the Governor issued Executive Order No. 455, G. L. c. 262, § 41, was the only statutory authority to prescribe fees chargeable by notaries public, and it remains so today. Nonetheless, the Legislature's inclusion of "any other" source of fee limits contemplates that if the Legislature enacts subsequent fee limits for notarial acts other than protests, §§ 16 and 19 will function to enforce those new limits as well. Thus, just like the executive order that preceded them, references to § 41 in §§ 16 and 19 simply enforce the fee limitations established in § 41 by establishing civil and criminal penalties for charging excessive fees for the services enumerated in § 41. See G. L. c. 222, § 18.

The plaintiff also contends that G. L. c. 222, § 23, evidences the Legislature's implicit understanding that G. L. c. 262, § 41, limited fees for all notarial acts. Section 23

prohibits charging any fee for certain notarial acts: "Notwithstanding [G. L. c. 262, § 41], no fee shall be charged by a notary public to notarize a signature on an absentee ballot identification envelope or other voting materials or on any application or claim by a United States military veteran for a pension, allotment, allowance, compensation, insurance or other veterans' benefit."  Because § 23 forbids fees for specific acts unrelated to protest "[n]otwithstanding" G. L. c. 262, § 41, the plaintiff argues that the Legislature must have understood § 41 to regulate all notarial acts, not just protest-related ones. We have acknowledged that "[t]he use of such a 'notwithstanding' clause clearly signals the drafter's intention that the provisions of the 'notwithstanding' section override conflicting provisions of any other section."  Attorney Gen. v. Commissioner of Ins., 450 Mass. 311, 319 (2008), quoting Cisneros v. Alpine Ridge Group, 508 U.S. 10, 18 (1993).  However, the "notwithstanding" clause in § 23 does not change the complete absence of language in G. L. c. 222 purporting to extend the $1.25 fee limit in § 41 to all notarial acts.  Further, regardless of the Legislature's understanding of the scope of § 41, referencing the section in G. L. c. 222, or anywhere else, does not and cannot have the effect of amending § 41 itself. That is, even if the Legislature passed G. L. c. 222 with the mistaken assumption that § 41 limits the maximum fees for all

notarial acts, this would not broaden § 41's original scope.

See Massachusetts Comm'n Against Discrimination v. Liberty Mut.

Ins. Co., 371 Mass. 186, 194 (1976) ("[t]he views of a

subsequent [Legislature] form a hazardous basis for inferring

the intent of an earlier one" [citation omitted]).

Nothing in the language or legislative history of G. L.

c. 222, §§ 16 and 19, or any other sections of c. 222, indicates

that the Legislature intended to change the scope of the fee

structure prescribed by § 41.[13]

Conclusion. We answer the certified question as follows:

No -- G. L. c. 262, §§ 41 and 43, do not proscribe fees in

excess of $1.25 for notarial acts unrelated to the act of

protest, and neither Executive Order No. 455 nor G. L. c. 222

has any impact on our interpretation of either section.

The Reporter of Decisions is to furnish attested copies of

this opinion to the clerk of this court. The clerk in turn will

transmit one copy, under the seal of the court, to the clerk of

the United States District Court for the District of

Massachusetts, as the answer to the question certified, and will

also transmit a copy to each party.

---

[13] Of course, should there be a desire on the part of the Legislature or the Governor (by way of G. L. c. 222, § 19; see note 10, supra) to cap fees at $1.25 for all notarial acts, they can do so directly, by way of statute or executive order, respectively.